[No. S074850. Aug. 23, 1999.]

HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES
INTERNATIONAL UNION, Petitioner, v.
GRAY DAVIS, as Governor, etc., et al., Respondents;
FRANK LAWRENCE, Real Party in Interest.

[No. S074851. Aug. 23, 1999.]

ERIC CORTEZ et al., Petitioners, v.
GRAY DAVIS, as Governor, etc., Respondent;
FRANK LAWRENCE et al., Real Parties in Interest.

586

**COUNSEL**

Davis, Cowell & Bowe, Richard G. McCracken, Andrew J. Kahn and Michael T. Anderson for Petitioner Hotel Employees and Restaurant Employees International Union.

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Steven A. Merksamer, John E. Mueller, Richard D. Martland and Cathy A. Christian for William Campbell and Barry Keene as Amici Curiae on behalf of Petitioner Hotel Employees and Restaurant Employees International Union.

Skadden, Arps, Slate, Meagher & Flom, Frank Rothman, Darrell J. Hieber, Harriet S. Posner, Gary S. Glickman, Gibson, Dunn & Crutcher,

Theodore B. Olson, John H. Sharer, Wayne W. Smith, Jeffrey H. Reeves, Thomas S. Jones and Amanda R. Wheeland for Petitioners Cortez et al.

Horvitz & Levy, Ellis J. Horvitz, Barry R. Levy and John A. Taylor, Jr., for the Dehesa Valley Community Council as Amicus Curiae on behalf of Petitioners Cortez et al.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Manuel M. Meideros, Assistant Attorney General, Sara J. Drake, Kenneth R. Williams, Ronald L. Diedrich and Timothy M. Muscat, Deputy Attorneys General, for Respondents.

Munger, Tolles & Olson, Mark H. Epstein, Douglas A. Axel and Linda M. Burrow for Real Parties in Interest.

Lacy & Lacy and James V. Lacy for California Young Americans for Freedom, Bruce Herschensohn, Congressman Dana Rohrabacher, State Senators Dave Kelley and Cathie Wright, Assemblymen Tony Strickland and Brett Granlund, Brett R. Barbre, Director, Yorba Linda Water District, and Matthew Harper, Governing Board Member, Huntington Beach High School District as Amici Curiae on behalf of Real Parties in Interest.

California Indian Legal Services, James E. Cohen, Michael S. Pfeffer and Stephen V. Quesenberry for Blue Lake Rancheria, Bridgeport Paiute Indian Colony, Cedarville Rancheria, Guidiville Indian Rancheria, Karuk Tribe of California, La Jolla Band of Indians, Manzanita Bank of Mission Indians, Mesa Grande Band of Mission Indians, North Fork Rancheria, Pauma Band of Mission Indians, Table Bluff Reservation-Wiyot Tribe, Timbisha Shoshone Tribe, the Torres Martinez Desert Cahuilla Indians and the U Tu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation as Amici Curiae on behalf of Real Parties in Interest.

Carole E. Goldberg for Indian Law Professors Jo Carrillo, Reid Chambers, Robert N. Clinton, Richard B. Collins, Arturo Gandara, Gerald Gardner, David Getches, Raleigh Levine, Nell Newton, Monroe Price, Rennard Strikland and Charles F. Wilkinson as Amici Curiae on behalf of Real Parties in Interest.

Gerald F. Uelman for California State Firefighters' Association, Palm Springs Chamber of Commerce, Murrieta Chamber of Commerce and Temecula Valley Chamber of Commerce as Amici Curiae on behalf of Respondents and Real Parties in Interest.

Van Bourg, Weinberg, Rozen & Rosenfeld and Sandra Rae Benson for California State Building and Construction Trades Council, Building and

Construction Trades Council of Alameda, AFL-CIO, Contra Costa Building and Construction Trades Council and Napa/Solano Counties Building and Construction Trades Council as Amici Curiae on behalf of Respondents and Real Parties in Interest.

Robert D. Purcell for Laborers' International Union of North America as Amicus Curiae on behalf of Respondents and Real Parties in Interest.

Castle & Krause and Tamara Utens for San Bernardino County Safety Employees' Association as Amicus Curiae on behalf of Respondents and Real Parties in Interest.

## OPINION

**WERDEGAR, J.**—In 1984, the people of California amended our Constitution to state a fundamental public policy against the legalization in California of casino gambling of the sort then associated with Las Vegas and Atlantic City: "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e), added by initiative, Gen. Elec. (Nov. 6, 1984).)

In 1998, at the November 3 General Election, the people approved a proposed initiative statute designated on the ballot as Proposition 5—"The Tribal Government Gaming and Economic Self-Sufficiency Act of 1998"— concerning gaming on Indian lands in the State of California. The principal provisions of this statutory initiative purport to authorize various forms of gaming in tribal casinos. As we will explain, to authorize such gaming facilities, however, would be to authorize casinos of the type expressly prohibited by article IV, section 19, subdivision (e) of the California Constitution (hereafter section 19(e)). Because Proposition 5, a purely statutory measure, did not amend section 19(e) or any other part of the Constitution, and because in a conflict between statutory and constitutional law the Constitution must prevail, we conclude Proposition 5's authorization of casino gambling is invalid and inoperative.

We further conclude that only one provision of Proposition 5, the state's consent to suit contained in the final sentence of Government Code section 98005, is separable from the measure's invalid provisions. With the exception of that single provision, therefore, we will issue the writ sought by petitioners, prohibiting the Governor and the Secretary of State from implementing Proposition 5.

PROCEDURAL BACKGROUND

On November 4, 1998, Proposition 5 became effective by operation of law. (See Cal. Const., art. II, § 10, subd. (a).) Between November 4 and 12, the Governor received a request from each of 39 Indian tribes for the state to enter into a standard "Tribal-State Gaming Compact" as set forth in the measure to cover gaming on Indian lands. Under the measure, the Governor was obligated to execute an individual compact within 30 days after receipt of a request and would be deemed to have done so if he should fail. Under the federal Indian Gaming Regulatory Act (IGRA) (Pub.L. No. 100-497 (Oct. 17, 1988) 102 Stat. 2467, as amended, codified at 25 U.S.C. § 2701 et seq. and 18 U.S.C. § 1166 et seq.), before any such compact could go into effect, the Secretary of the Interior had to publish notice in the Federal Register that he had given his approval within a prescribed review period of 45 days. (25 U.S.C. § 2710(d)(3)(B), (d)(8)(C) & (d)(8)(D).)

On November 20, 1998, the Hotel Employees and Restaurant Employees International Union (hereafter the Union) filed a petition for writ of mandate in this court, with a request for a stay pendente lite. In its petition, the Union sought to compel Pete Wilson, in his official capacity as Governor, now succeeded by Gray Davis who takes his place by substitution, and Bill Jones, in his official capacity as Secretary of State, not to implement Proposition 5, claiming the measure was invalid under the law of both California and the United States. The Union named Frank Lawrence, the measure's proponent, as real party in interest. On that same day, Eric Cortez and others (hereafter collectively Cortez) filed a separate, similar petition for writ of mandate in this court, also with a request for a stay pendente lite, and also seeking to compel the Governor not to implement the measure, on the grounds it is invalid under state and federal law. Cortez named Californians for Indian Self-Reliance, as well as Frank Lawrence (hereafter collectively Real Parties) as real parties in interest.

On December 2, we acted in response to the petitions. ▮ We did so in recognition that a writ of mandate is available, in the absence of a "plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086), against the implementation of an invalid statute (*Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 264 [226 Cal.Rptr. 361]). We determined to decide the matter ourselves, instead of allowing lower courts, in accordance with our custom, to address it in the first instance (see, e.g., *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 500 [286 Cal.Rptr. 283, 816 P.2d 1309]), because we concluded the underlying questions were of "great public importance and must be resolved promptly"

(*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; accord, *Legislature* v. *Eu, supra,* at p. 500).

We therefore ordered the Governor, the Secretary of State, and Real Parties to show cause in this court why the relief the Union and Cortez sought against Proposition 5 should not be granted, and stayed implementation of the measure pendente lite. Pursuant to our orders, Real Parties, and the Governor and the Secretary of State filed returns to the petitions, and the Union and Cortez each filed a traverse. In his initial returns, Governor Wilson supported the Union's and Cortez's claims against Proposition 5 and their prayers for relief. With our leave, Governor Davis later withdrew the returns of Governor Wilson and filed substitute returns of his own, in which he expressed neutrality on the claims against Proposition 5 and the prayers for relief. On January 13, 1999, we ordered the Union's cause and that of Cortez consolidated for purposes of oral argument and decision.

On or about January 22, 1999, the Secretary of the Interior disapproved the tribal-state gaming compacts requested by Indian tribes under Proposition 5, reasoning that, because this court had stayed the operation of the measure, the compacts, which had not actually been executed by the Governor, could not be deemed executed pursuant to the measure's 30-day provision.

DISCUSSION

I. *Legal Background*

Proposition 5 was enacted against an extensive legal background of California and federal law regarding gaming and other gambling. We briefly review the most pertinent parts of these bodies of law.

A. *California Gambling Law*

Since 1849, the California Constitution has generally prohibited all lotteries and the sale of all lottery tickets. In the original document of 1849, the Constitution prohibited all lotteries and the sale of all lottery tickets, doing so in article IV, section 27. In the current document of 1879, it continues the prohibition, formerly in article IV, section 26, and presently in article IV, section 19, subdivision (a), which declares: "The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State." Since 1872, section 319 et seq. of the Penal Code also has prohibited all lotteries and the sale of all lottery tickets. But since 1984, through the addition of article IV, section 19, subdivision (d), the California Constitution

has provided: "Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery."

As we explained in *Western Telcon, Inc.* v. *California State Lottery* (1996) 13 Cal.4th 475, 484 [53 Cal.Rptr.2d 812, 917 P.2d 651] (*Western Telcon*), a lottery is defined by three elements, namely, a prize, distribution by chance, and consideration. "Consideration" is the fee (in the form of money or anything else of value) that a participant pays the operator for entrance. (See *Cal. Gas. Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 853-854, 857-862 [330 P.2d 778].) "Chance" means that winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill. (*Finster* v. *Keller* (1971) 18 Cal.App.3d 836, 844-845 [96 Cal.Rptr. 241]; *People* v. *Hecht* (1931) 119 Cal.App.Supp. 778, 784-787 [3 P.2d 399].) "Prize" encompasses property that the operator offers to distribute to one or more winning participants and not to keep for himself. (*Western Telcon*, *supra*, at pp. 485-488.) The property offered may exist apart from the fees the participants pay the operator or it may arise from the fees themselves, as when, in the commonly used parimutuel system, the property consists of the fees in the form of a pool that remains after the operator has taken out some amount for himself. (*Id.* at p. 488 & fn. 4.) The prize or prizes, however, must be "either fixed in advance" of the play or "determined by the total amount" of fees paid. (*Id.* at p. 489.)

Commencing in 1872, the year of the Penal Code's enactment, section 330 of that code has proscribed a number of games by name; since 1885 (Stats. 1885, ch. 145, § 1, p. 135), the list has included the game "twenty-one." Also commencing in 1872, section 330 of the Penal Code has prohibited all "banking" games, that is, those games in which there is a person or entity that participates in the action as "the one against the many" (*People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 970 [265 P.2d 191]), "taking on all comers, paying all winners, and collecting from all losers" (*Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5]), doing so through a fund generally called the bank (*Western Telcon*, *supra*, 13 Cal.4th at p. 487).

As we expressly held in *Western Telcon*, a banking game is not a lottery, and a lottery is not a banking game, for the two are "mutually exclusive." (13 Cal.4th at p. 494.) In a lottery, the "operator distributes the prize or prizes to the winner or winners . . . ." (*Id.* at p. 485.) The operator is not a participant and, hence, does not compete with the participants. He has "no interest in the outcome of" the lottery, "because neither the fact the prize will be disposed of, nor the value of the prize to be distributed, depends upon which, or how many," of the participants "might win it." (*Id.* at p. 488.)

Insofar as the operator is concerned, the result is invariable: he will give over the prize to one or more of the participants. (See *id.* at pp. 485-486.) In a banking game, by contrast, the banker "pays off all winning wagers and keeps all losing wagers." (*Id.* at p. 485.) He is in fact a participant and, hence, "compete[s] with the other participants: 'he is the one against the many.'" (*Id.* at p. 488.) He has an "interest in the outcome of the game, because the amount of money" he "will have to pay out," or be able to take in, "depends upon whether each of the individual bets is won or lost." (*Ibid.*) The result is variable: the banker may either win or lose as to either some or all of the other participants. (See *id.* at pp. 485, 487, 489, 494.)

Commencing in 1885, section 330 of the Penal Code has similarly prohibited all "percentage" games, that is, those games in which the operator does not participate in the action but "collects a percentage . . . computed from the amount of bets made, winnings collected, or . . . money changing hands." (*Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 679.)

Since at least 1872, all nonprohibited card games, primarily "round" games such as various forms of poker, have been permitted. (See, e.g., *Monterey Club* v. *Superior Court* (1941) 48 Cal.App.2d 131, 148-149 [119 P.2d 349].) Nevertheless, as reflected in section 19800 et seq. of the Business and Professions Code, such games are subject to regulation by the state and, in the absence of state regulation, to regulation and even prohibition by localities. (See *Western Telcon, supra,* 13 Cal.4th at p. 482, fn. 2 [stating that gambling games that are not prohibited "are generally subject to local control, with some state regulation"].)

Since 1911, section 330a of the Penal Code has prohibited all slot machines; section 330b of the same code, enacted in 1950, has redoubled the prohibition. The Penal Code's broad definitions of slot machines include virtually every kind of stand-alone gaming device. Section 330a impliedly defines slot machines as "any . . . machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in, or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from such machine, when the result of action or operation of such machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance . . . ." (Pen. Code, § 330a, as added by Stats. 1911, ch. 483, § 1, p. 951.)

Section 330b expressly defines slot machines, in similar terms, as encompassing "[a]ny machine, apparatus or device . . . that is adapted, or may readily be converted into one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, such machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, credit, allowance or thing of value or additional chance or right to use such slot machine or device, or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise, indication of weight, entertainment or other thing of value." (Pen. Code, § 330b, subd. (2), as added by Stats. 1950, First Ex. Sess. 1950, ch. 17, § 1, pp. 452-453; see also Pen. Code, § 330.1 [containing similar definition].)

Beginning in 1933, the California Constitution has authorized the Legislature to allow horse races and horse race wagering. (See now Cal. Const., art. IV, § 19, subd. (b), former art. IV, § 25a.) As reflected in section 19400 et seq. of the Business and Professions Code, the Legislature has done so, permitting licensed wagering in accordance with the parimutuel system. (Bus. & Prof. Code, §§ 19590, 19593.)

Beginning in 1976, in article IV, section 19, subdivision (c), the California Constitution has authorized the Legislature to permit bingo: "Notwithstanding subdivision (a)," which proscribes lotteries, "the Legislature by statute may authorize cities and counties to provide for bingo games, but only for charitable purposes." As reflected in section 326.5 of the Penal Code, the Legislature has done so.

Lastly, since 1984, through the addition of section 19(e), the California Constitution has declared: "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."

B. *Federal Indian Gaming Law*

We now briefly review the federal law concerning gaming on Indian lands.

In 1987, the United States Supreme Court handed down its landmark decision in *California* v. *Cabazon Band of Mission Indians* (1987) 480 U.S.

202 [107 S.Ct. 1083, 94 L.Ed.2d 244] (*Cabazon*), interpreting Public Law No. 280 (Aug. 15, 1953) 67 Statutes at Large 588. In Public Law No. 280, Congress granted certain states, including California, broad criminal jurisdiction over offenses committed by or against Indians in Indian country (including "all land within the limits of any Indian reservation under the jurisdiction of the United States Government" (18 U.S.C. § 1151)) within their respective borders. Pursuant to this grant, the *Cabazon* court held, the laws of these states generally applied to activities in Indian country to the extent the law was "prohibitory," but did not generally apply to the extent it was "regulatory," the shorthand test being whether the conduct at issue violates the state's public policy. (*Cabazon*, *supra*, at pp. 207-210 [107 S.Ct. at pp. 1087-1089].) On the particular question at issue, whether California could apply to certain Indian tribes on their reservations its law governing the operation of bingo (Pen. Code, § 326.5), the high court gave a negative answer: "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular." (*Cabazon*, *supra*, at p. 211 [107 S.Ct. at p. 1089], fn. omitted.)

In 1988, in the wake of *Cabazon*, Congress enacted IGRA (Pub.L. No. 100-497 (Oct. 17, 1988) 102 Stat. 2467, as amended, codified at 25 U.S.C. § 2701 et seq. and 18 U.S.C. § 1166 et seq.), with the declared purpose to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" (25 U.S.C. § 2702(1)), while at the same time providing a basis for regulation of Indian gaming so as to shield it from organized crime and corruption, prevent exploitation for non-Indian profit, and ensure fair and honest gaming. (IGRA, § 3; 25 U.S.C. § 2702(1), (2).)

Section 4 of IGRA divides gaming into three categories—"class I," "class II," and "class III." (25 U.S.C. § 2703(6), (7), (8).)

Class I gaming is "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." (25 U.S.C. § 2703(6).)

Class II gaming is defined to include: "(i) the game of chance commonly known as bingo" and "(ii) card games" that "are explicitly authorized by the laws of the State" or "are not explicitly prohibited by the laws of the State and are played at any location in the State," "but only if such card games are

played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games." (25 U.S.C. § 2703(7)(A).) The act excludes from its definition of class II gaming: "(i) any banking card games, including baccarat, chemin de fer, or blackjack (21)" and "(ii) electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." (*Id.*, § 2703(7)(B).)

Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming." (25 U.S.C. § 2703(8).)

Section 11 of IGRA provides for the regulation of each of the three categories of gaming—from the lightest regulation for class I, by tribal action alone without federal or state participation; to heavier regulation for class II, by joint federal and tribal participation; to the heaviest regulation for class III, by state and tribal participation through tribal-state compacts plus federal oversight. (25 U.S.C. § 2710.)

Specifically as to class III gaming, section 11(d)(1) of IGRA states that class III gaming activities are "lawful . . . only if such activities are": "(A) authorized by an ordinance or resolution" that, among other things, is adopted by an Indian tribe and approved by the Chairman of the National Indian Gaming Commission; "(B) located in a State that permits such gaming for any purpose by any person, organization, or entity"; and "(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." (25 U.S.C. § 2710(d)(1).) Section 11(d)(3)(A) of IGRA describes the process whereby the Indian tribe and the state may commence negotiations toward a tribal-state compact: the tribe must "request" that the state "enter into negotiations," and, on receiving such request, the state must proceed to "negotiate with the Indian tribe in good faith . . . ." (25 U.S.C. § 2710(d)(3)(A).) A compact takes effect only when approved by the Secretary of the Interior. (25 U.S.C. § 2710(d)(3)(B).)

## C. *Legal Conflicts Leading up to Proposition 5*

Despite IGRA's negotiation and compact framework, several unresolved conflicts have developed between the State of California and Indian tribes surrounding class III gaming and, especially, gaming devices in casinos. Class III gaming, comprising all gaming outside class I and class II, including parimutuel horse race wagering, lotteries, banked table games and gaming devices, is, unquestionably, the "most lucrative kind." (*U.S.* v. *Spokane Tribe of Indians* (9th Cir. 1998) 139 F.3d 1297, 1299.)

The most notable conflict is that underlying *Rumsey Indian Rancheria of Wintun Ind.* v. *Wilson* (9th Cir. 1994) 64 F.3d 1250. Pursuant to IGRA,

several Indian tribes requested the State of California to negotiate compacts permitting "stand-alone electronic gaming devices" and "live banking and percentage card games." (*Id.* at p. 1255, fns. omitted.) The state refused, asserting that its criminal law prohibited the games and devices in question. The state and certain tribes agreed to seek judicial determination through a test case whether the state was obligated to enter into negotiations concerning such games and devices; pursuant to that stipulation, the tribes initiated an action in federal district court for declaratory relief against the state. (*Ibid.*)

The district court gave summary judgment to the plaintiff tribes, concluding that, except for games using traditional casino game themes, the state was indeed obliged to negotiate over the games and devices in question. (*Rumsey Indian Rancheria of Wintun Ind. v. Wilson, supra,* 64 F.3d at p. 1255.) The Ninth Circuit Court of Appeals reversed in large part, concluding that, because California prohibited anyone in the state to engage in banked or percentage card games or operation of slot machines ("[w]ith the possible exception of slot machines in the form of video lottery terminals" (*id.* at p. 1260)), IGRA did not require the state to negotiate a compact allowing those activities to be conducted in tribal gaming facilities. (*Id.* at pp. 1256-1258.) On remand, the district court determined California law did not permit slot machines in the form of California State Lottery terminals or otherwise, and ordered judgment for the defendants. (*Rumsey Indian Rancheria of Wintun Ind. v. Wilson* (E.D.Cal. 1998) 39 F.Supp.2d 1227.)

While the above proceedings and those leading to this court's 1996 decision in *Western Telcon, supra,* 13 Cal.4th 475, were pending, a number of the tribes commenced and continued class III gaming activities without tribal-state compacts; in response, Governor Wilson refused to negotiate further until they ceased such gaming activities. (See Note, *Western Telcon v. California State Lottery; Will Native Americans Lose Again?* (1997) 19 Thomas Jefferson L.Rev. 361, 374-376.) Governor Wilson instead negotiated a compact with the Pala Band of Mission Indians, a tribe previously without gaming facilities, which he intended to serve as a statewide model. In part because of objections to the negotiation procedures and in part because of restrictions the Pala compact placed on the type and number of gaming devices, most of the tribes with existing casinos rejected the Pala compact. (See Comment, *The Effect of the Indian Gaming Regulatory Act on California Native American's Independence* (1998) 35 San Diego L.Rev. 179, 198-201).

It was to resolve such conflicts between the State of California and Indian tribes relative to class III gaming on Indian lands that Proposition 5 was

drafted and circulated by petition. (See Gov. Code, § 98001, subd. (b) [measure intended to end "uncertainties" regarding class III gaming by tribes].) That the initiative measure might not meet its purpose was known before the election: after the measure qualified for the ballot, but prior to the election, the Legislative Counsel issued an opinion concluding, inter alia, that the measure would be invalid under section 19(e) because it would authorize "casinos of the type currently operating in Nevada and New Jersey." (Ops. Cal. Legis. Counsel, No. 21947 (Oct. 8, 1998) Tribal Gaming: Proposition 5, pp. 8-14, 17-18.) At the election the people nevertheless approved the measure.

## II. *Proposition 5*

Having reviewed Proposition 5's legal background and context, we turn to the measure itself. Proposition 5 adds a single title to the Government Code, viz., title 16, "State-Tribal Agreements Governing Indian Gaming," which contains a single chapter, viz., chapter 1, "The Tribal Government Gaming and Economic Self-Sufficiency Act of 1998," which comprises sections 98000 through 98012.

*Section 98001 of the Government Code* contains three findings made by the people as electors.

The first finding opens as follows: "[H]istorically, Indian tribes within the state have long suffered from high rates of unemployment and inadequate educational, housing, elderly care, and health care opportunities, while typically being located on lands that are not conducive to economic development in order to meet those needs. . . ." (Gov. Code, § 98001, subd. (a).) It notes that federal law (i.e., IGRA) "provides a statutory basis" for gaming on Indian lands "as a means of strengthening tribal self-sufficiency through the creation of jobs and tribal economic development." (Gov. Code, § 98001, subd. (a).) It also notes that federal law provides for class III gaming pursuant to tribal-state compacts. (*Ibid.*)

The second finding states that "uncertainties have developed over various issues concerning class III gaming and the development of Tribal-State compacts between the state and tribes, and . . . those uncertainties have led to delays and considerable expense." (Gov. Code, § 98001, subd. (b).) It proceeds to declare that the terms of the model tribal-state compact set forth in Proposition 5 "are intended to resolve those uncertainties in an efficient and cost-effective way, while meeting the basic and mutual needs of the state and the tribes without undue delay. The resolution of uncertainty regarding class III gaming in California, the generation of employment and

tribal economic development that will result therefrom, and the limitations on the growth of gaming in California that are inherent therein, are in the best and immediate interest of all citizens of the state. . . ." (*Ibid.*)

The third finding declares as follows: "[C]asinos of the type currently operating in Nevada and New Jersey are materially different from the tribal gaming facilities authorized under" Proposition 5, including its model tribal-state compact, "in that the casinos in those states (1) commonly offer their patrons a broad spectrum of house-banked games, including but not limited to house-banked card games, roulette, dice games, and slot machines that dispense coins or currency, none of which games are authorized under this chapter; and (2) are owned by private companies, individuals, or others that are not restricted on how their profits may be expended, whereas tribal governments must be the primary beneficiaries of the gaming facilities" hereunder, and "are limited to using their gaming revenues for various tribal purposes, including tribal government services and programs such as those that address reservation housing, elderly care, education, economic development, health care, and other tribal programs and needs, in conformity with federal law." (Gov. Code, § 98001, subd. (c).)

*Section 98002 of the Government Code,* among other things, authorizes and obligates the Governor to execute the model tribal-state compact on behalf of the State of California "as a ministerial act, without preconditions, within 30 days after receiving a request from" an Indian tribe "to enter into such a compact." (Gov. Code, § 98002, subd. (a).)

*Section 98004 of the Government Code* sets forth Proposition 5's model tribal-state compact. On behalf of the State of California, it "offers" such compact to any federally recognized Indian tribe that may choose to request and accept the compact. (Gov. Code, § 98004.) While the model compact contains numerous provisions detailing the manner in which tribal gaming facilities are to be licensed, staffed and operated, for present purposes we need review only those provisions pertinent to the scope of gaming permitted.

*Section 3.0 of the model tribal-state compact* "authorize[s] and permit[s]" the Indian tribe to engage in the class III gaming activities expressly referred to in section 4 of the compact.

*Section 4.0 of the model tribal-state compact* sets out the scope of class III gaming activities. It authorizes and permits the Indian tribe to engage in the following four "forms or types of class III gaming" (Gov. Code, § 98004, model compact § 4.1):

First, the "operation of Tribal gaming terminals," provided, inter alia, that the Indian tribe "shall pay prizes solely in accordance with a players' pool prize system." (Gov. Code, § 98004, model compact § 4.1(a).) "Tribal gaming terminal" is defined as a "gaming device" of any kind "that does not dispense coins or currency and is not activated by a handle." (*Id.*, model compact § 2.21.)

Second, the "operation of any [class III] card games that were actually operated in any tribal gaming facility in California on or before January 1, 1998," provided that the Indian tribe "shall pay prizes solely in accordance with a players' pool prize system." (Gov. Code, § 98004, model compact § 4.1(b).)[1]

Third, the "operation of any lottery game, including, but not limited to, drawings, raffles, match games, and instant lottery ticket games." (Gov. Code, § 98004, model compact § 4.1(c).)

Fourth, the operation of off-track parimutuel horse race wagering under specified terms and conditions, including consistency with an existing tribal-state compact covering the same subject. (Gov. Code, § 98004, model compact § 4.1(d).)

Section 4.0 of the model compact also authorizes the Indian tribe to "establish and operate gaming facilities" and generally to "combine and operate" therein "any forms and kinds of gaming permitted under law." (Gov. Code, § 98004, model compact § 4.2.)

*Section 98005 of the Government Code* provides, among other things, that if the Governor does not execute a model tribal-state compact requested by an Indian tribe within 30 days after receiving its request, he will be "deemed" to have done so "to the extent permitted by law." (Gov. Code, § 98005.) This section also contains a waiver on the state's part of immunity to suit in federal court for certain compact-related disputes. (*Ibid.*)

*Section 98006 of the Government Code* states that the gaming authorized pursuant to Proposition 5, including, but not limited to, the gaming authorized pursuant to its model tribal-state compact, "is not subject to any

---

[1]The record does not contain an exhaustive list of the card games played at tribal casinos on or before January 1, 1998, but there is no dispute they included one or more forms of blackjack or twenty-one. (See Ballot Pamp., Analysis by Legis. Analyst of Prop. 5, as presented to the voters, Gen. Elec. (Nov. 3, 1998) p. 20 ["Currently, . . . Indian gambling operations in California . . . offer a variety of gambling activities . . . includ[ing] bingo, card games (including a type of blackjack), and electronic (video) gambling devices."].)

prohibition in state law now or hereafter enacted. Without limiting the foregoing, and notwithstanding any other provision of law, the following forms of gaming specifically are permitted and authorized to be conducted on Indian lands by a tribe that has entered into" a tribal-state compact:

First, any class III card games "that were operated on any Indian reservation in California on or before January 1, 1998," including, evidently, twenty-one or blackjack, subject to specified terms and conditions, including that the Indian tribe must pay prizes solely in accordance with a so-called "players' pool prize system." (Gov. Code, § 98006, subd. (a).)

Second, "[a]ny gaming or gambling device," also subject to specified terms and conditions, including that such devices may not "dispense coins or currency and are not activated by handles," and that the Indian tribe must pay prizes solely in accordance with a players' pool prize system. (Gov. Code, § 98006, subd. (b).)

Third, the "operation of any lottery game, including, but not limited to, drawings, raffles, match games, and instant lottery ticket games." (Gov. Code, § 98006, subd. (c).)

A "players' pool prize system" is defined as "one or more segregated pools of funds that have been collected from player wagers, [that] are irrevocably dedicated to the prospective award of prizes in [authorized gaming activities,] and in which the house neither has acquired nor can acquire any interest. The tribe may set and collect a fee from players on a per play, per amount wagered, or time-period basis, and may seed the pools in the form of loans or promotional expenses, provided that the seeding is not used to pay prizes previously won." (Gov. Code, § 98006, subd. (a); accord, *id.*, § 98004, model compact § 2.16].)

*Section 98009 of the Government Code* declares that the provisions of Proposition 5's model tribal-state compact "are hereby incorporated into state law, and all gaming activities, including but not limited to gaming devices, authorized therein are expressly declared to be permitted as a matter of state law to any Indian tribe entering into" such a compact. (Gov. Code, § 98009.)

III.  *Proposition 5 and California Constitution, Article IV, Section 19(e)*

We turn to the claims by the Union and Cortez that Proposition 5 is invalid under the California Constitution, specifically section 19(e)'s declaration that "[t]he Legislature has no power to authorize . . . casinos of the

type currently operating in Nevada and New Jersey." We consider and decide the causes before us on the pleadings, without recourse to evidentiary proceedings, for none of the papers raise any question as to a matter of fact essential to determination of the petition. (Code Civ. Proc., § 1090.)

A statute inconsistent with the California Constitution is, of course, void. (*Nougues* v. *Douglass* (1857) 7 Cal. 65, 70.) In order to decide whether Proposition 5 is inconsistent with section 19(e), we begin by examining and interpreting each part of section 19(e).

*"The Legislature has no power . . . ."*

The "power" referred to is, of course, the *legislative* power, which is the subject of article IV of the California Constitution as a whole. The legislative power may be exercised by either of two legislative bodies, inasmuch as article IV, section 1 declares that it is "vested" in the Legislature and also "reserve[d]" to the people acting through initiative, specifically, initiative statute. Section 19(e) could, therefore, be taken, relatively narrowly, to deny legislative power to the Legislature alone of the two legislative bodies, or, relatively broadly, to deny legislative power to the legislative body as such and, hence, to both legislative bodies. For two reasons, we conclude the broader interpretation is the correct one.

First, as we held in *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 674 [194 Cal.Rptr. 781, 669 P.2d 17], "[a] statutory initiative is subject to the same state and federal constitutional limitations as are the Legislature and the statutes which it enacts." In that case, we interpreted a provision of the state Constitution requiring that "[i]n the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of" various electoral districts. (Cal. Const., art. XXI, § 1.) Having previously held that this provision, and its predecessor, limited the Legislature to one reapportionment every ten years (see *Legislature* v. *Deukmejian, supra,* at pp. 668-671), we considered and rejected the "novel theory" that this implied limitation applied only to the Legislature and not to the people's reserved initiative power. (*Id.* at p. 673.) We found this theory "puzzling inasmuch as the reserved power to enact statutes by initiative is a legislative power, one that would otherwise reside in the Legislature. It has heretofore been considered to be no greater with respect to the nature and attributes of the statutes that may be enacted than that of the Legislature." (*Ibid.*) In the passing years, we have adhered to that broad holding without deviation. (See *Rossi* v. *Brown* (1995) 9 Cal.4th 688, 696, fn. 2 [38 Cal.Rptr.2d 363, 889 P.2d 557]; *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52

Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317]; *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 821 [226 Cal.Rptr. 81, 718 P.2d 68]; but see *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 252 [279 Cal.Rptr. 325, 806 P.2d 1360] [rule does not apply to "procedural requirements addressed to the Legislature's deliberations" unless evidence shows such application was intended].) We see no reason either to depart from or further narrow *Legislature* v. *Deukmejian* today.

Second, section 19(e), the anticasino provision, parallels in language, and was presumably based upon, the preexisting antilottery provision of California Constitution, article IV, section 19, subdivision (a) (hereafter section 19(a)), which declares, "[t]he Legislature has no power to authorize lotteries . . . ." Section 19(a) dates back to 1879 and to the very establishment of the current California Constitution in that year. At that time, prior to the 1911 constitutional amendment that provided for the initiative (see Stats. 1911, Ex. Sess., pp. xvi-xviii), the Legislature was the sole legislative body. At that time, therefore, to deny legislative power to the Legislature was necessarily to deny legislative power to the legislative body as such. In 1911, when the people took the legislative power for themselves, they took it on these terms; they did not exempt themselves from existing substantive limits on the legislative power. After 1911 and to the present day, then, section 19(a) barred either legislative body, the people or the Legislature, from authorizing lotteries (subject, of course, to the exceptions in article IV, section 19, subdivisions (c) and (d) for charitable bingo and the California State Lottery). As "[t]he Legislature" in section 19(a) thus denotes the legislative body as such, meaning both the Legislature itself and the people acting through initiative statute, and as section 19(e) was apparently modeled upon section 19(a) and deals with a closely related subject, we should similarly interpret section 19(e) as restricting the legislative power in both its forms of exercise.

We recognize that in 1879, to which the substance of the antilottery provision dates, "[t]he Legislature" could not have been used to exclude the people as a legislative body, inasmuch as the people were not yet such, while in 1984, to which the anticasino provision dates, the phrase could have been so used. There is no indication, however, that it was. From all that appears, section 19(e) was designed to proscribe casinos—specifically, "casinos of the type currently operating in Nevada and New Jersey"—by *constitutional* force, preventing any future legislative authorization of such casinos without constitutional amendment. (See Ballot Pamp., Analysis by Legis. Analyst of Prop. 37, as presented to the voters, Gen. Elec. (Nov. 6, 1984) p. 46 [in addition to establishing state lottery, Proposition 37 "would amend the

Constitution to prohibit in California gambling casinos of the type that exist in Nevada and New Jersey. (Casino gambling currently is prohibited within the state by a statute, but not by the Constitution.)"].) It was *not* designed to proscribe the specified casinos only if they were authorized by the Legislature.[2]

### *"Casinos."*

In common usage around the time that section 19(e) was added to the California Constitution in 1984, a "casino" was defined simply as "a building or room for gambling." (Webster's New Internat. Dict. (3d ed. 1961) p. 347; accord, e.g., Rose, Gambling and the Law (1986) at p. 4.) In the anticasino provision itself, it does not appear to demand any different signification.

### *"Of the type currently operating in Nevada and New Jersey."*

"Currently" is potentially ambiguous, in that it could refer to 1984, the time of its use in section 19(e), or to the time at which prohibited casinos are purportedly authorized. We adopt the former view. To declare, "The Legislature has no power to authorize . . . casinos of the type . . . operating in Nevada and New Jersey" in 1984, addresses an evil that was knowable and, in fact, known at the time the anticasino provision was added, that is, the kind of casino then existing in those states. By contrast, to declare, "The Legislature has no power to authorize . . . casinos of the type . . . operating in Nevada and New Jersey" from time to time, addresses an evil, if evil it be, that is altogether unknown and unknowable. That the amendment drafters or the voters intended only such an attenuated effect is unlikely.

The sense of the other words in this phrase within section 19(e) requires more effort to discern. What was meant by "the type" of casino "operating in Nevada and New Jersey" in 1984? Section 19(e) contains no definition of this phrase. Logic and reference to legislative history, however, allow us to

---

[2]Unlike the parties, Justice Kennard focuses on the word "authorize" in section 19(e), arguing that because "it is federal law, not state law, that authorizes Indian gambling . . . the model compact of Proposition 5 does not authorize Indian gambling and thus does not violate section 19(e)." (Dis. opn. of Kennard, J., *post*, at p. 616.) By their terms, however, both the tribal-state compact (Gov. Code, § 98004, model compact § 4.1) and Government Code section 98006 would "authorize[]" various forms of gaming in tribal gaming facilities. Moreover, as *federal* legal authority for class III gaming is, under IGRA, dependent in two ways on *state* authorization (see 25 U.S.C. §§ 2710(d)(1)(B) [requiring such gaming be permitted under state law], 2710(d)(1)(C) [requiring existence of compact entered into by state and tribe]), Justice Kennard's attempt to draw a bright line between federal and state authority in this area is unavailing.

see with reasonable clarity what the drafters and voters intended to prohibit in 1984.

The 1984 constitutional amenders must have had in mind a type of gambling house unique to or particularly associated with Nevada and New Jersey, since they chose to define the prohibited institution by reference to those states. On this logic, the "type" of casino referred to must be an establishment that offers gaming activities including banked table games and gaming devices, i.e., slot machines, for in 1984 that "type" of casino was legal only in Nevada and New Jersey and, hence, was particularly associated with those states. (See Rose, Gambling and the Law, *supra*, at p. 4 [of the states, only Nevada and New Jersey allow "[c]asinos offering the full range of gambling games"]; *id.* at pp. 6-7 [detailing gaming operations of the "average Atlantic City casino" in 1984]; Com. on the Review of the Nat. Policy Toward Gambling, Final Rep., Gambling in America (1976) pp. 88-89 [detailing gaming operations of Nevada casinos].)

Similarly, "the type" of casino "operating in Nevada and New Jersey" presumably refers to a gambling facility that did *not* legally operate in California; something other, that is, than "the type" of casino "operating" in California. The type of casino then operating in California is what has commonly been called a "card room" (see, e.g., *Bristow* v. *Morelli* (1969) 270 Cal.App.2d 894, 897 [76 Cal.Rptr. 203]) or "card club" (see, e.g., *Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 793 [168 Cal.Rptr. 878]), a type that did *not* offer gaming activities including banking games and gaming devices. (See Rose, Gambling and the Law, *supra*, at pp. 3-4.) A California card room or card club was *not* permitted to offer gaming activities in the form of: (1) lotteries; (2) banking games, whether or not played with cards; (3) percentage games, whether or not played with cards; (4) slot machines; or (5) games proscribed by name, including twenty-one— all of which were prohibited at least by statute. (See pt. I.A., *ante.*)

Thus, a casino of "the type . . . operating in Nevada and New Jersey" may be understood, with reasonable specificity, as one or more buildings, rooms, or facilities, whether separate or connected, that offer gambling activities including those statutorily prohibited in California, especially banked table games and slot machines.

Real Parties object to this approach as rendering section 19(e) merely an elevation of statutory prohibitions on certain activities to the constitutional level. But the available legislative history suggests section 19(e) was designed, precisely, to elevate statutory prohibitions on a set of gambling

activities to a constitutional level. (See Ballot Pamp., Analysis by Legis. Analyst of Prop. 37 as presented to the voters, Gen. Elec. (Nov. 6, 1984) p. 46 [in addition to establishing state lottery, Proposition 37 "would amend the Constitution to prohibit in California gambling casinos of the type that exist in Nevada and New Jersey. (Casino gambling currently is prohibited within the state by a statute, but not by the Constitution.)"]; Ballot Pamp., argument in favor of Prop. 37 as presented to the voters, Gen. Elec. (Nov. 6, 1984) p. 48 [Proposition 37 "adds a new CONSTITUTIONAL PROHIBITION AGAINST CASINO GAMBLING"].) Voters on the 1984 initiative would thus have understood the constitutional provision they added, section 19(e), as focusing on a set of statutorily prohibited activities, i.e. "casino gambling," and as endowing the existing statutory bars on that set of activities with a new, constitutional status.

From the interpretation of section 19(e), we turn to determining the effect of Proposition 5. As stated, Proposition 5, including its model tribal-state compact, authorizes tribal gaming facilities and authorizes in such facilities the operation of tribal gaming terminals, grandfathered class III card games, lotteries, and off-track parimutuel horse race wagering under specified terms and conditions.

As shown below, Proposition 5, including its model tribal-state compact, authorizes what would amount to prohibited casinos. With their tribal gaming terminals and grandfathered class III card games, tribal gaming facilities authorized under the measure would constitute facilities that offer gambling activities including those statutorily prohibited to card clubs in California in 1984, especially banked table games and slot machines.

According to Real Parties, who rely on the "players' pool prize system" of Proposition 5, the grandfathered class III card games, specifically including blackjack, are lotteries. According to the Union and Cortez, they are banking games.

We conclude the card games in question are not lotteries, but banking games. Here, unlike in lotteries, the Indian tribe does *not* "distribute" to a "winner or winners" (*Western Telcon, supra*, 13 Cal.4th at p. 485), with "no interest in the outcome" of the play (*id*. at p. 488), a "prize or prizes" (*id*. at p. 485) that are invariable because they are "either fixed in advance or determined by the total amount" of fees paid (*id*. at p. 489). Rather, as in other banking games, the tribe, through the prize pool, simply "pays off all winning wagers and keeps all losing wagers" (*id*. at p. 485), which are variable "because the amount of money" it "will have to pay out," or be able

to take in, "depends upon whether each of the individual bets is won or lost" (*id.* at p. 488).

That the tribe must "pay[] all winners, and collect[] from all losers" (*Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 678) through a fund that is styled a "players' pool" is immaterial: the players' pool is a bank in nature if not in name. It is a " ' "fund against which everybody has a right to bet, the bank . . . taking all that is won, and paying out all that is lost." ' " (*Western Telcon, supra,* 13 Cal.4th at p. 487.) Theoretically, an extraordinary run of good luck by one or more gamblers in a short period could exhaust the players' pool, thus breaking the bank, a course of events that cannot occur even theoretically in a lottery. (*Id.* at p. 488.) True, the players' pool is limited in what it pays—but not in what it collects—in that the tribe is prohibited from lending the pool money "to pay prizes previously won" (Gov. Code, § 98004, model compact § 2.16; accord, *id.,* § 98006, subd. (a)). But, as we explained in *Western Telcon,* the fact that payouts on wagers must be made from a limited fund of money does not transform a banking game into a lottery. (*Western Telcon, supra,* at pp. 493-494.) Such a banker simply finds itself "in the enviable position of a gambler who has, by law, an upper limit to his losses." (*Id.* at p. 494.)

That Proposition 5 does not limit tribal casinos to card games operated as lotteries is especially clear if one focuses on the manner in which payouts are calculated under the "players' pool" system. Although this fund is the only permitted source of payouts, nothing in Proposition 5 or its model compact requires that payouts be calculated as *shares* of the "pool." (See *Western Telcon, supra,* 13 Cal.4th at p. 492 [California State Lottery's Keno a banking game rather than a lottery because payouts are fixed rather than "calculated as shares of a 'prize pool.' "].) Of course, a lottery may use fixed prizes rather than a parimutuel system. "In a fixed-prize lottery, however, the *total* prize amount must be fixed in advance of the draw. If fixed prizes are offered, in other words, the number of such prizes must also be determined in advance of the draw." (*Id.* at p. 490, italics in original.) Again, nothing in Proposition 5 or its model compact requires that the number of fixed payouts for a given game be determined in advance of the game.[3]

Real Parties argue the games allowed under Proposition 5 are not *house* banked because the casino's tribal owner-operator cannot profit from surpluses in the "players' pool," which is dedicated to payment of prizes. Even

---

[3]Justice Kennard compares the players' prize pool system to the "rollover" feature sometimes used in lotteries. (Dis. opn. of Kennard, J., *post,* at p. 624.) There is little comparison between such an isolated feature of a lottery and the pervasive pooling of revenue—not only from round to round, but over indefinite time periods and between games as well—characterizing the players' prize pool system. In any event, prizes in even a rolled-over lottery are calculated as shares of the ticket sales; payouts in the games authorized by Proposition 5

if true, this limitation would not make the games lotteries rather than banking games, since a banking game, within the meaning of Penal Code section 330's prohibition, may be banked by someone other than the owner of the gambling facility. (*Oliver* v. *County of Los Angeles* (1998) 66 Cal.App.4th 1397, 1407-1409 [78 Cal.Rptr.2d 641].)[4] In any event, that the tribal operator does not profit from the prize pool's winnings is not strictly true. The tribe retains an "interest in the outcome" of play (*Western Telcon, supra,* 13 Cal.4th at p. 488) even if it "neither has nor can acquire any interest" in the players' pool itself, which is "irrevocably dedicated to the prospective award of prizes in authorized gaming activities" (Gov. Code, § 98004, model compact § 2.16; accord, *id.,* § 98006, subd. (a)). The more the players' pool collects from losers and the less it pays to winners, the lower the tribal operator's costs—the less likely it will be compelled to lend seed money to the players' pool in the future, the more likely it will be able to obtain repayment of seed money lent to the pool in the past. Conversely, the less the pool collects and the more it pays, the higher the operator's costs. Of necessity, moreover, the operator of a casino authorized under Proposition 5 must be concerned with maintaining ample funds in the players' pool or pools, since depletion of those funds will require lower payouts, hence worse odds on players' bets, hence less action to generate fee revenue for the operator. Even under Proposition 5's players' pool prize system, therefore, the "house" retains an interest in the outcome of play.

As to the "Tribal gaming terminals" (Gov. Code, § 98004, model compact §§ 2.21, 4.1(a)) or "gaming or gambling device[s]" (*id.,* § 98006, subd. (b)) authorized by Proposition 5, Real Parties contend they differ from the slot machines found in Nevada and New Jersey casinos in two respects: first, they are not house banked, but rather operate as lotteries, because they must be conducted according to the players' pool prize system, and second, they "do not dispense coins or currency and are not activated by handles" (Gov. Code, § 98006, subd. (b); accord, *id.,* § 98004, model compact § 2.21). The first assertion, as we have just seen, is incorrect. The player's pool prize system does not convert a game or device into a lottery; tribal gaming devices are not lottery terminals, rather than slot machines, merely because a player's winnings must come from, and his or her losses go into, a particular fund. The second assertion, while true, is immaterial. A slot machine is no

would neither be calculated as shares of revenue for the game nor as a prespecified number of fixed prizes.

[4]For the same reason, Justice Kennard's argument that games operated according to the players' prize pool system are lotteries, rather than banking games, because the tribal operator assertedly has no interest in the outcome (dis. opn. of Kennard, J., *post,* at p. 624), would fail even if its factual premise were true. The *pool* itself functions as a bank, collecting from all losers and paying all winners.

less a slot machine under California law because it dispenses a "credit, allowance or thing of value," rather than money (Pen. Code, § 330b, subd. (2)), or because it is "caused to operate" by one "means" rather than another (*ibid.*). Nor would the voters on the 1984 constitutional amendment likely have understood section 19(e) to permit casinos so long as the slot machines therein were activated by buttons rather than levers, and dispensed chips or electronic credits rather than coins.[5]

Real Parties point to several other respects in which tribal casinos authorized by Proposition 5 will presumably differ from the archetypical 1984 Nevada or New Jersey casino: tribal casinos will not be clustered together in an urban "strip"; tribal casinos, assertedly, may not serve free alcohol; tribal casinos will not be able to offer banked noncard games such as craps and roulette; and tribal casinos will be owned by tribes and the revenues used for tribal purposes. These asserted characteristics, however, fail meaningfully to distinguish casinos authorized under Proposition 5 from those prohibited by section 19(e). We think it highly unlikely that the 1984 constitutional amenders, who were told the measure before them would constitutionalize California's statutory prohibitions on "casino gambling," were concerned with such secondary nongambling features of casinos as their mutual proximity or service of free alcohol. As to banked noncard games, we cannot agree that a casino offering activities including banked card games and slot machines differs in fundamental type from one offering, in addition, roulette and craps. Finally, because private ownership and for-profit operation were not unique to Nevada and New Jersey gambling facilities in 1984, and, indeed, characterized permitted California facilities such as card clubs and horse racing tracks, private ownership and for-profit operation could not logically have been the characteristics to which the constitutional amenders intended to refer in prohibiting "casinos of the type currently operating in Nevada and New Jersey."

In concluding as we do, we do not overlook the finding made in Proposition 5 that "casinos of the type currently operating in Nevada and New Jersey are materially different from . . . tribal gaming facilities . . . in that the casinos in those states (1) commonly offer their patrons a broad spectrum of house-banked games, including but not limited to house-banked card

---

[5]Apart from their identity as banking games rather than lotteries, the card games and devices in question are within the prohibition of Penal Code section 330—which section 19(e) was intended, in part, to constitutionalize—to the extent that the Indian tribe may, under Proposition 5, collect fees from players on a per-amount-wagered basis: to that extent, they may be played as percentage games. And the grandfathered card games are also within section 330 to the extent that they include twenty-one, or blackjack: to that extent, they are proscribed by name.

games, roulette, dice games, and slot machines that dispense coins or currency, none of which games are authorized" under the measure, including its model tribal-state compact; and "(2) are owned by private companies, individuals, or others that are not restricted on how their profits may be expended, whereas tribal governments must be the primary beneficiaries of the gaming facilities . . . , and are limited to using their gaming revenues for various tribal purposes, including tribal government services and programs such as those that address reservation housing, elderly care, education, economic development, health care, and other tribal programs and needs, in conformity with federal law." (Gov. Code, § 98001, subd. (c).)

■ "As a general rule, '[i]t is not the judiciary's function . . . to reweigh the [findings of] "legislative facts" underlying a legislative enactment.' " (*American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307, 348 [66 Cal.Rptr.2d 210, 940 P.2d 797] (plur. opn. of George, C. J.).) To the extent the quoted findings actually state legislative facts, we follow the general rule of deference here. Thus we may take it as given, for example, that the tribal facilities authorized by Proposition 5 would use their net revenues for tribal purposes, and that in this respect they differ from privately owned Nevada and New Jersey casinos. As just discussed, however, private ownership and for-profit operation did not distinguish Nevada and New Jersey casinos from California card clubs in 1984 and, therefore, these were almost certainly not the characteristics to which the drafters and voters intended to refer when barring authorization of casinos "of the type currently operated in Nevada and New Jersey."

■ To the extent the quoted findings do not consist of legislative fact, but of statutory or constitutional interpretation—interpretation of section 19(e) or of California statutory law regarding lotteries and banking games— the general rule of deference is not implicated. The "finding" to the effect that the games and devices authorized under Proposition 5 are not banked card games and slot machines, for example, is a pure statement of law that we must independently evaluate (and, having done so, have found incorrect). Most importantly, the general statement that "casinos of the type currently operating in Nevada and New Jersey are materially different from the tribal gaming facilities authorized under this chapter" (Gov. Code, § 98001, subd. (c)) is not a "finding" of "legislative fact" or indeed of any other kind of "fact." Rather, it is a construction of the anticasino provision of section 19(e). As such, it commands no deference on our part, because we construe the provisions of the California Constitution independently. (*Nougues* v. *Douglass, supra,* 7 Cal. at p. 70 ["It would be idle to make the Constitution the supreme law, and then require the judges to take the oath to support it,

and after all that, require the Courts to take the legislative construction as correct"]; see also *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 354 [276 Cal.Rptr. 326, 801 P.2d 1077].)

Against the conclusion that Proposition 5 is invalid as inconsistent with the anticasino provision of section 19(e), Real Parties argue that IGRA preempts the anticasino provision itself. More particularly, they argue that under IGRA states may not regulate the manner in which permitted class III games are played or, indeed, impose any regulation except to prohibit specific games, by any means other than a tribal-state compact. Because section 19(e) is not a prohibition on particular gaming activities, but on conducting them in a Nevada- or New Jersey-style casino, Real Parties argue, IGRA preempts its application to tribal gaming.

Real Parties' preemption argument fails because neither of the premises upon which it rests is true. First, contrary to their representation, IGRA does not exempt gambling on Indian lands from state regulatory laws. Indeed, section 23 of IGRA provides that "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." (18 U.S.C. § 1166(a).) Subsection (c) of the same section recognizes an exception to that rule for class III gaming conducted under a tribal/state compact but, as we further explain below, such a compact may not go into effect unless it is validly entered into under state law, which the model compact in Proposition 5 could not be, because its approval would violate section 19(e). In the absence of a valid tribal-state compact, therefore, California law regulating class III gaming activities does apply to such gaming on Indian lands, although the federal government has exclusive jurisdiction to prosecute violations of that law criminally. (18 U.S.C. § 1166(d); see *U.S. v. E.C. Investments, Inc.* (9th Cir. 1996) 77 F.3d 327, 330-331 [in absence of compact, prohibition of slot machines in Penal Code section 330b applies to operation of such devices on Indian reservation, although only the federal government has jurisdiction to prosecute a violation].) Second, the argument incorrectly characterizes section 19(e): that provision *does*, in substantial part, prohibit specific gambling activities, including slot machines, banked card games and other banking games, when conducted in a casino setting.

More generally, Real Parties' reliance on IGRA is misplaced because IGRA legalizes only gaming conducted pursuant to a compact validly entered into by both the state and the tribe. In section 11(d)(1), IGRA declares that "[c]lass III gaming activities" are "lawful . . . only if such activities are

. . . conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." (25 U.S.C. § 2710(d)(1).) To be "entered into" by the state and the tribe means to be "entered into" *validly* in accordance with state (and tribal) law. (See *Pueblo of Santa Ana* v. *Kelly* (10th Cir. 1997) 104 F.3d 1546, 1555 [concluding "the 'entered into' language imposes an independent requirement and the compact must be validly entered into by a state before it can go into effect, via Secretarial approval, under IGRA" (fn. omitted)]; *id.* at pp. 1550-1551, 1557-1559 [agreeing with New Mexico Supreme Court that compact was invalid under the law of that state because the Governor did not have authority, without legislative enactment, to bind state to compact authorizing casino gambling otherwise prohibited by state law]; *Kickapoo Tribe of Indians* v. *Babbitt* (D.D.C. 1993) 827 F.Supp. 37, 44-46, reversed on other grounds *sub nom. Kickapoo Tribe of Indians in Kansas* v. *Babbitt* (D.C. Cir. 1995) 43 F.3d 1491 [same as to compact invalidly signed by Governor of Kansas]; see also *Seminole Tribe of Fla.* v. *Florida* (1996) 517 U.S. 44, 47 [116 S.Ct. 1114, 1119, 134 L.Ed.2d 252] [observing that IGRA "provides that an Indian tribe may conduct certain gaming activities only in conformance with a *valid* compact between the tribe and the State" (italics added)].)

With respect to a tribal-state compact, IGRA balances the interests of the state and the tribe. Its balancing is predicated on a recognition that the state and the tribe are sovereigns, albeit sovereigns subordinate to the federal union. That fact is implied in its provisions and is express in its legislative history, which presents the "use of compacts between tribes and states" as the "best mechanism to assure that the interests of both sovereign entities are met . . . ." (Sen.Rep. No. 100-446, 2d Sess., p. 13 (1988), reprinted in 1988 U.S. Code Cong. & Admin. News, at p. 3083.) To recognize that the state and the tribe are sovereigns entails an acknowledgment that the law of each operates in its proper sphere and, therefore, that the law of each governs the validity of its own entry into a compact. IGRA would not make lawful particular gaming activities included in a compact if the compact itself were not validly entered into under the law of both the state and the Indian tribe in question. Such is the case here for the model tribal-state compact set forth in Proposition 5: entry into such a compact is beyond the legislative power under the law of California, conflicting as it would with the anticasino provision of section 19(e).

IV.  *Severability of Valid and Invalid Provisions*

We therefore conclude Proposition 5 is inconsistent with the anticasino provision of section 19(e), insofar as it authorizes what would amount to

proscribed casinos. ■ Of course, a statute that is invalid as inconsistent with the California Constitution is not ineffective and inoperative to the extent that its invalid parts can be severed from any valid ones. (See, e.g., *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821-822 [258 Cal.Rptr. 161, 771 P.2d 1247].) An invalid part can be severed if, and only if, it is "grammatically, functionally and volitionally separable." (*Id.* at p. 821.) It is "grammatically" separable if it is "distinct" and "separate" and, hence, "can be removed as a whole without affecting the wording of any" of the measure's "other provisions." (*Id.* at p. 822.) It is "functionally" separable if it is not necessary to the measure's operation and purpose. (See *id.* at pp. 821, 822.) And it is "volitionally" separable if it was not of critical importance to the measure's enactment. (*Id.* at p. 822.)

■ Although Proposition 5 and its model tribal-state compact both contain severability clauses (Gov. Code, § 98004, model compact § 14.0; *id.,* § 98007), and although Proposition 5's invalid parts authorizing what would amount to proscribed casinos are grammatically separable, the invalid provisions are not functionally or volitionally separable from the remainder of the model compact or from Proposition 5 as a whole. First, the model compact as a whole is inseparable, both functionally and volitionally, from the compact's authorization of casino gambling. Without the provisions authorizing the operation of tribal gaming terminals and grandfathered class III card games, tribal gaming facilities would remain authorized—but without resolution of the chief conflicts over class III Indian gaming that prompted the measure's circulation and passage. By the measure's own declaration, its authorization of gaming, including that authorized in the model tribal-state compact, was intended to be comprehensive, that is, to resolve the "uncertainties" regarding class III gaming, including tribal gaming terminals and class III card games, "in an efficient and cost-effective way." (Gov. Code, § 98001, subd. (b).) It would not be such if it should prove to resolve nothing about these gaming activities. Nor can the compact as a whole be considered volitionally separate from its authorization of casino gambling. The scope of authorized gambling was of "critical" importance to the "enactment" of the measure, including its offer of a model compact (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 822), because the scope of gambling was of critical importance to the measure itself.

Even apart from Government Code section 98004, which sets forth the model compact, and Government Code section 98006, which separately but in parallel fashion authorizes tribes to operate casinos prohibited by section 19(e), almost all of the measure's remaining provisions are functionally

dependent on the existence of a model compact and the authorization of casino gambling. Setting aside the title (Gov. Code, § 98000), findings (*id.*, § 98001), severability clause (*id.*, § 98007), grant of gubernatorial signing authority (*id.*, § 98008), guide to construction (*id.*, § 98010) and amendability clause (*id.*, § 98012), none of which could function separate from the measure as a whole, all the remaining sections of the measure except section 98005 concern the model compact or the gambling authorized under the compact and Government Code section 98006. (*Id.*, §§ 98002, 98003, 98004, 98006, 98009, 98011.)

The first sentence of Government Code section 98005, as well, concerns the model compact. The second, and final, sentence of section 98005, however, deals with a functionally separate subject—the state's waiver of immunity from suit in disputes arising out of negotiations for new or amended tribal-state compacts *other* than the measure's model compact. It provides as follows: "Without limiting the foregoing, the State of California also submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith, the state's refusal to enter into negotiations concerning the amendment of a Tribal-State compact to which the state is a party, or to negotiate in good faith concerning that amendment, or the state's violation of the terms of any Tribal-State compact to which the state is or may become a party." (Gov. Code, § 98005.)

The consent to suit contained in the final sentence of Government Code section 98005 is functionally separable from the measure's authorization of casino gambling and its model compact. It concerns neither the scope of gambling permitted to tribes nor the implementation of the model compact but, rather, the resolution of future disputes concerning the negotiation, amendment and performance of compacts "different" from Proposition 5's model compact. In significant part, it would affect the resolution of any dispute arising out of the course of future negotiations for compacts that tribes may seek in lieu of the compact invalidly offered in Proposition 5.

The final sentence of Government Code section 98005 is also volitionally separable from Proposition 5's authorization of casino gambling and its model compact. The enactors of Proposition 5 sought, among other things, to expedite and remove obstacles from the process of reaching tribal/state agreements on class III gaming. (Gov. Code, § 98001, subd. (b).) They

sought to do so within the framework of IGRA. (*Id.*, subd. (a).) As part of its framework for negotiating class III gaming compacts, IGRA provides for a tribal action in United States District Court against a state that has refused to negotiate for a compact or has failed to do so in good faith. (25 U.S.C. § 2710(d)(7)(A)(i).) The tribal remedy provided by Congress lost its effectiveness, however, with the United States Supreme Court decision in *Seminole Tribe of Fla.* v. *Florida, supra,* 517 U.S. 44, to the effect that state sovereign immunity embodied in the Eleventh Amendment prevents Congress from authorizing suits in federal district court by Indian tribes against states to enforce legislation enacted under the Indian Commerce Clause and, hence, that, in the absence of a state's consent to suit, the Eleventh Amendment renders invalid IGRA's purported grant to such court of jurisdiction. The final sentence of Government Code section 98005, in providing the state's consent to such a suit, is obviously intended to restore to California tribes the remedy provided in IGRA. Because doing so will tend to effectuate and expedite IGRA's process for achieving class III Indian gaming compacts, one of the express goals of Proposition 5, we are confident the enactors of Proposition 5 would have approved this portion of the measure even if they had known the remainder could not constitutionally be given effect.

The final sentence of Government Code section 98005 also survives the other challenges petitioners make to Proposition 5's validity: it is not beyond the people's initiative power as failing to enact a statute; subject to constitutional limitations, a statute may define the scope of the government's immunity to suit. (See, e.g., 28 U.S.C. §§ 2671-2680 [federal Tort Claims Act]; Gov. Code, §§ 810-997.6 [California Tort Claims Act].) It does not impermissibly infringe on the Governor's executive power, as waiver of immunity is not an exclusively executive function. (See *ibid.*) It is not preempted by IGRA, as it is consistent with and furthers the purposes of IGRA. (Because all other provisions of Proposition 5 are invalid under section 19(e) or are inseparable from such invalid provisions, we need not address petitioners' remaining challenges as they concern Proposition 5 in general.)

CONCLUSION AND DISPOSITION

For the reasons stated above, we conclude that Proposition 5, except for the final sentence of Government Code section 98005, is invalid because it is inconsistent with the anticasino provision of article IV, section 19, subdivision (e) of the California Constitution.

We therefore discharge the orders to show cause and direct issuance of a peremptory writ of mandate compelling the Governor and the Secretary of

State not to implement Proposition 5, with the exception of the final sentence of Government Code section 98005.

George, C. J., Chin, J., Brown, J., Gilbert, J.,* and Gaut, J.,† concurred.

**KENNARD, J.,** Dissenting.—One of the fundamental powers reserved to the people of this state is the power to enact legislation by initiative. This court has recognized the importance of that power: "[T]he initiative power must be *liberally construed* to promote the democratic process. [Citation.] Indeed it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise. . . . [A]ll presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309], italics in original.)

At the November 1998 General Election, the voters of California exercised their initiative power and enacted into law Proposition 5. The initiative offers Indian tribes a model agreement, or compact, regulating the conditions of gambling on Indian lands. Federal law requires either such a compact, or authorization by the Secretary of the Interior, before tribes may conduct gambling.

Today, the majority rejects the will of the people by invalidating the model compact of Proposition 5. It concludes that the compact authorizes forms of gambling the state Constitution prohibits and therefore exceeds the people's power to legislate. Specifically, section 19, subdivision (e) (section 19(e)) of article IV of the California Constitution forbids legislation "authoriz[ing]" casinos of the type operating in New Jersey and Nevada. According to the majority, two of the forms of gambling regulated by the model compact—gaming terminals and card games operated under a "players' pool prize system"—are banking games rather than lotteries, and are therefore forms of casino gambling prohibited under section 19(e). In the majority's view, the model compact authorizes these forms of casino gambling and therefore violates section 19(e). I disagree.

First, because federal law has preempted the field of Indian gambling regulation, it is federal law, not state law, that authorizes Indian gambling.

---

*Associate Justice of the Court of Appeal, Second District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Associate Justice of the Court of Appeal, Fourth District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Federal law encourages tribes and states to enter into compacts addressing gambling on Indian land. By entering into a compact with a tribe, a state may influence the conditions under which Indian gambling is conducted and the regulations to which the gambling is subject, but a state lacks the power to either forbid or authorize Indian gambling. Thus, contrary to the majority, the model compact of Proposition 5 does not authorize Indian gambling and thus does not violate section 19(e) of article IV of the California Constitution.

Second, federal law authorizes a tribe to offer any form of gaming otherwise permitted by the state in which the tribe is located. California law permits lotteries but prohibits banking games. The gaming terminals and card games regulated by Proposition 5's model compact are lotteries rather than banking games because they operate under a players' pool prize system. Therefore, federal law authorizes California tribes to offer these games.

I

*The Primacy of Federal Authority Over Indian Gambling*

As the aboriginal possessors of America, Indian tribes have a unique and sovereign relationship with both the federal government and the states within which they are located. Tribal sovereignty and the federal power over Indian relations greatly limit the power of states to regulate Indian tribes and activities on tribal lands without congressional authorization. " 'Indian relations [are] the exclusive province of federal law.' " (*Seminole Tribe of Fla.* v. *Florida* (1996) 517 U.S. 44, 60 [116 S.Ct. 1114, 1125, 134 L.Ed.2d 252].) From the earliest days of our nation, states have lacked any general sovereign power over Indian tribes and tribal lands. As Chief Justice John Marshall said in a case rejecting the State of Georgia's attempt to apply its criminal laws within Cherokee tribal lands: "The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States." (*Worcester* v. *Georgia* (1832) 31 U.S. (6 Pet.) 515, 561 [8 L.Ed. 483, 501].)

As the United States Supreme Court has explained, there are two independent but related barriers to a state's attempt to assert its power over activities on Indian lands. (*White Mountain Apache Tribe* v. *Bracker* (1980) 448 U.S.

136, 142-145 [100 S.Ct. 2578, 2582-2585, 65 L.Ed.2d 665].) One is the sovereign status of Indian tribes; the other is the federal Constitution's grant of power to Congress over Indian affairs. (*Ibid.*)

These barriers are not entirely fixed, however; Congress may also delegate to the states some of its power over Indian affairs by authorizing the application of state law to Indian affairs. For example, in title 18 United States Code section 1162, enacted in 1953, Congress granted to certain states (including California) jurisdiction over criminal offenses in "Indian country," and it extended state criminal law to Indian country. Subsequently, California asserted that this grant of criminal jurisdiction authorized it to apply state gambling laws to Indian country.

In *California* v. *Cabazon Band of Mission Indians* (1987) 480 U.S. 202 [107 S.Ct. 1083, 94 L.Ed.2d 244], the United States Supreme Court rejected California's argument that in enacting title 18 United States Code section 1162 Congress had intended to extend all state gambling laws to Indian country. Rather, the high court held that under section 1162 only those state laws that entirely prohibited a particular form of gambling ("criminal/ prohibitory" laws) could be applied to Indian country, and not those state laws that only restricted but did not prohibit a form of gambling ("civil/ regulatory" laws). (480 U.S. at p. 209 [107 S.Ct. at p. 1088].)

In the wake of that decision, Congress in 1988 enacted a detailed statutory scheme, the Indian Gaming Regulatory Act (IGRA), to regulate gambling on tribal lands. (Pub.L. No. 100-497 (Oct. 17, 1988) § 23, 102 Stat. 2467, codified at 18 U.S.C. §§ 1166-1168 and 25 U.S.C. §§ 2701-2721.) In the structure and scope of IGRA, which comprehensively addresses all forms of gambling on Indian lands, Congress made clear its intent that IGRA preempt the field of regulation of Indian gambling. Congress also made clear this intent to preclude state jurisdiction over Indian gambling in the statute's legislative history: "[IGRA] is intended to expressly preempt the field in the governance of gaming activities on Indian lands." (Sen.Rep. No. 100-446, 2d Sess., p. 6 (1988) reprinted at 1988 U.S. Code Cong. & Admin. News, p. 3076.) "[U]nless a tribe *affirmatively elects* to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally *impose or allow* State jurisdiction on Indian lands for the regulation of Indian gaming activities." (*Id.*, 1988 U.S. Code Cong. & Admin. News, at p. 3075, italics added.)

IGRA divides all forms of gambling into three classes. The forms of gambling regulated by Proposition 5 and at issue here are so-called "class III

gaming activities." (25 U.S.C. § 2703.) Section 2710(d)(1) of title 25 of the United States Code (hereafter section 2710(d)(1)), as a matter of *federal* law, conditionally authorizes tribes to engage in class III gaming activities that the state permits someone else to engage in. IGRA establishes three conditions for authorization: "Class III gaming activities shall be lawful on Indian lands only if such activities are— [¶] (A) authorized by an ordinance or resolution" adopted by the tribe and approved by the Chairman of the National Indian Gaming Commission, "(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and [¶] (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." (*Ibid.*) The second condition for authorization (condition (B)) is essentially the distinction that *California* v. *Cabazon Band of Mission Indians, supra,* 480 U.S. 202, drew between gambling activities a state absolutely prohibits, and those it regulates or restricts but does not prohibit. In the words of IGRA: "Indian tribes have the *exclusive right* to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (25 U.S.C. § 2701(5), italics added.)

Section 2710(d) further provides a detailed mechanism by which a tribe may negotiate and enter into a tribal-state gambling compact, and by which the Secretary of the Interior may authorize tribal gambling in the absence of a tribal-state gambling compact if a state refuses to enter into such a compact. Nothing in those provisions suggests that a state may use the process of negotiating and entering into compacts to prohibit a tribe from engaging in class III gaming activities that the state permits someone else to engage in.

IGRA also removed the power of states, recognized in *California* v. *Cabazon Band of Mission Indians, supra,* 480 U.S. 202, to apply to Indian lands those state laws absolutely prohibiting a particular form of gambling. Instead, IGRA included a new federal criminal statute, codified at 18 United States Code section 1166, criminalizing gambling in "Indian country" that is not authorized by IGRA. The federal statute adopts "for purposes of Federal law" state gambling laws, but the federal government has exclusive jurisdiction to prosecute these offenses. (*Ibid.*)

Thus, if a state authorizes class III gaming activities by *anyone,* federal law authorizes a tribe to engage in those same activities once the tribe adopts an Indian gambling ordinance approved by the Chairman of the National Indian Gaming Commission and enters into a compact with the state. If the

state fails or refuses to reach an agreement with the tribe, the Secretary of the Interior may authorize tribal gambling.

Several crucial points emerge from this review of IGRA. First, authorization or prohibition of Indian gambling is exclusively a matter of paramount federal law. Where Indian gambling is authorized, it is authorized by operation of federal law. Where Indian gambling is prohibited, it is prohibited by operation of federal law. Although a state's gambling law may shape the contours of the federal authorization, a state may not directly prohibit Indian gambling as such. A state may not criminalize or prosecute any tribal gambling activities, even for forms of gambling that the state prohibits to everyone. Only the federal government may prosecute gambling that IGRA does not authorize. Nor can a state on its own authorize Indians to engage in gambling, even gambling that it permits everyone else to engage in. For example, even if slot machines were legal everywhere else in California, IGRA would still prohibit their use on a reservation absent an approved tribal ordinance and a tribal-state compact. Even the power of a state to shape the contours of federal authorization is extremely limited. Once a state permits even a single entity (including the state itself) to engage in a class III gaming activity, federal law authorizes all tribes within the state to engage in that form of gambling (once they adopt an approved tribal ordinance and either enter into a compact or, if the state refuses to enter into a compact, receive authorization from the Secretary of the Interior).

## II

### Does the Model Compact of Proposition 5 Violate the California Constitution?

Do the California Constitution's prohibitions of legislative authorization of gambling bar the state from entering into the model tribal-state compact in accordance with IGRA, as the majority concludes? The answer is no. Three state constitutional provisions found in section 19 of article IV of the California Constitution are pertinent. Subdivision (a) of article IV, section 19 provides: "The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State." Subdivision (d) of article IV, section 19 qualifies the lottery ban by authorizing a state lottery: "Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery." Subdivision (e) of article IV, section 19 provides: "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."

By entering into a tribal-state compact the state does not "authorize" lotteries or other forms of gambling. A state may only authorize, or prohibit,

acts that are within the limits of its sovereignty. For the reasons stated above, it is utterly beyond the sovereign power of California to authorize or prohibit gambling on Indian lands within the state. California can no more authorize gambling on Indian lands than it can authorize gambling in another state. Section 19 of article IV of the California Constitution removes from the Legislature any power that the Legislature would otherwise have to authorize or prohibit lotteries or gambling casinos. For Indian gambling, however, the Legislature would not otherwise have the power to authorize or prohibit lotteries or gambling casinos because federal law completely preempts the field of Indian gambling and it is federal law, not state law, that authorizes or prohibits Indian gambling. Although the state may *facilitate* Indian gambling by negotiating and entering into a compact, doing so does not *authorize* Indian gambling in the sense of granting permission for an act the state otherwise has the power to prohibit. Nor does a state's failure to enter into a compact have the effect of prohibiting Indian gambling, for in the absence of a compact IGRA directs the Secretary of the Interior to establish procedures governing tribal gambling. The Legislature or, in this case, the voters, cannot sensibly be described as "authorizing" something they lack the power to prohibit.

To be sure, as the majority notes, the model compact purports to "authorize" tribes to engage in certain forms of class III gaming. (Gov. Code, § 98004, Tribal-State Gaming Compact, § 4.1.) Whether a tribe is authorized to engage in class III gaming, however, is a question of federal, not state, law. Whatever the compact may say, it cannot authorize a tribe to engage in class III gaming. For example, if the state otherwise completely prohibits a form of class III gaming, a compact purporting to authorize a tribe to engage in that form of gambling would be ineffectual, for condition (B) of section 2710(d)(1) would prohibit the tribe as a matter of federal law from offering that form of gambling.[1]

The parallel case of an interstate compact regulating gambling in another state also illustrates why a tribal-state gambling compact does not unconstitutionally authorize gambling. To further California's interests, the Legislature has entered into a compact with the neighboring State of Nevada, the Tahoe Regional Planning Compact, regulating the number and size of gaming facilities located in Nevada within the Lake Tahoe Basin. (Gov. Code, § 66801, Tahoe Regional Planning Compact, art. VI, §§ (d), (f).) That

---

[1]Likewise, another portion of Proposition 5, Government Code section 98006, purports to "authorize" tribal gaming terminals and card games using a players' pool prize system. It, too, is misleading to the extent it claims to authorize gambling on tribal lands over which California lacks jurisdiction.

compact has never been considered to be an act by the Legislature authorizing casinos within the meaning of the term "authorize" as used in section 19 of article IV of the California Constitution.

Indeed, if any act of the State of California may be properly characterized as authorizing Indian gambling, it is the enactment of the constitutional provisions and statutes creating the California state lottery and horse race wagering. (Cal. Const., art. IV, § 19, subds. (b), (d).) These statutes authorizing forms of class III gambling trigger by force of federal law the collateral consequence of authorizing Indian tribes to engage in the same forms of gambling. But these statutes are constitutionally permitted; therefore, if they are the act of authorization of tribal gambling there is nothing unconstitutional about the authorization.

Accordingly, I conclude that the act of entering into a tribal compact pursuant to IGRA is not the authorization of gambling within the meaning of section 19 of article IV of the California Constitution, for under IGRA a state lacks the power either to authorize or prohibit a tribe from engaging in gambling. The next question is whether the forms of gambling addressed by Proposition 5's model compact are authorized by IGRA as a matter of federal law.

### III

*Does IGRA Authorize the Forms of Indian Gambling Regulated by Proposition 5's Model Compact?*

Because I conclude that the California Constitution does not bar the model compact of Proposition 5, I also reach the question of whether, as petitioners contend, the model compact conflicts with IGRA by allowing forms of gambling that IGRA does not authorize. In applying IGRA here, the initial question is whether two forms of class III gaming activities included in the model compact of Proposition 5—gaming terminals under a players' pool prize system and card games under a players' pool prize system—are forms of gambling otherwise permitted in California and therefore meet IGRA's second condition for authorization of class III gaming activities: "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . [¶] . . . [¶] (B) located in a State that permits such gaming for any purpose by any person, organization, or entity[.]" (§ 2710(d)(1).) In considering this question, it is important to recognize that, while state law defines the forms of gambling activities the state permits, the question of whether a form of tribal gambling falls within a category of gambling activities permitted by the state is ultimately a question of federal law.

The question whether gaming terminals under a players' pool prize system and card games under a players' pool prize system meet IGRA's above-quoted second condition for authorization of class III gaming activities can in turn be broken down into two subordinate questions. First, what forms of class III gaming does California permit, even if only to a single person or entity? The answer is lotteries and horse race wagering. Thus, any California Indian tribe may offer these forms of gambling, and federal law obligates the state to negotiate a tribal-state compact addressing these forms of gambling. Second, are the gaming terminals and card games under a players' pool prize system described in Proposition 5's model compact either lotteries or horse race wagering? For the reasons I shall explain hereafter, I conclude that gaming terminals and card games under a players' pool prize system are essentially lotteries and thus within the scope of gambling activities that California "permits . . . for any purpose by any person, organization, or entity." (§ 2710(d)(1).)

To determine whether gaming terminals and card games under a players' pool prize system are lotteries, it is necessary to examine the difference between a lottery and a banking game. In *Western Telcon, Inc.* v. *California State Lottery* (1996) 13 Cal.4th 475 [53 Cal.Rptr.2d 812, 917 P.2d 651], this court discussed this difference extensively. Although the state law definition of the term "lottery" is not ultimately controlling for purposes of federal law, the principles for distinguishing a lottery from a banking game discussed in that case are helpful here.

Our court said a lottery requires a prize offered by the operator, distributed on the basis of chance, to players who have paid consideration for the opportunity to win. (*Western Telcon, Inc.* v. *California State Lottery, supra,* 13 Cal.4th 475, 484.) We explained: "[A] ' "purse, prize, or premium is ordinarily some valuable thing offered by a person for the doing of something by others, into the strife for which he does not enter. He has not a chance of gaining the thing offered; and, if he abide by his offer, that he must lose it, and give it over to some of those contending for it, is reasonably certain." ' . . . '[a] lottery operator does not "wager" or hazard his property against that of others. Whether the property offered by the lottery operator will be distributed is not the issue, as it is in gaming; in a lottery, the only issue is to whom will the property be distributed—and the lottery operator, earning his revenue as a portion of the ticket sales, is not himself a contender for the prize.' " (*Id.* at pp. 485-486, italics omitted.)

"[T]he scheme in [*People* v.] *Postma* [(1945) 69 Cal.App.2d Supp. 814, 818 [160 P.2d 221]] was not a lottery because the operators offered no prize

for disposal or distribution to others. Instead, they bet individually against each participant on the outcome of a race. In each bet, the operators had a chance to win the other bettor's stake and retain their own. In each bet, by the same token, the operators risked losing their stake. Unlike a lottery operator, who has offered a prize for reasonably certain disposal and has no interest in the outcome of the chance device by which the winner or winners are chosen, the operators in *Postma* had an interest in the outcome of each bet. It was possible, at least theoretically, that the operators might win all the bets in a given race or, as the court noted, that they might lose all the bets, 'all bets being on the winning horse.' " (*Western Telcon, Inc.* v. *California State Lottery, supra*, 13 Cal.4th 475, 487.)

"These two categories of gambling [banking games and lotteries] are nonetheless exclusive of one another, and can be surely distinguished, not by the manner of play, but by *the nature of the betting itself.* (See, e.g., *In re Lowrie* [(1919)] 43 Cal.App. 564, 566-567 [185 P. 421] [complaint, alleging petitioner ran game in which the other participants bet against him on the outcome of a roll of dice, charged operation of a banking game, not a lottery, since petitioner allegedly kept a fund against which the other participants bet].) In a lottery the operator does not bet against any of the participants, but merely offers up a prize for distribution to one or more of them. The operator, in other words, has no interest in the outcome of the chance event that determines the winner or winners—the 'game' or 'draw'—because neither the fact the prize will be disposed of, nor the value of the prize to be distributed, depends upon which, or how many, of the lottery entrants might win it. In a banking game, in contrast, the operator does compete with the other participants: 'he is the one against the many.' (*People* v. *Ambrose* [(1953)] 122 Cal.App.2d [Supp. 966,] 970.) The operator thus has a direct interest in the outcome of the game, because the amount of money the operator will have to pay out depends upon whether each of the individual bets is won or lost.

"One corollary of the distinction drawn above is that the operator of a banked game may or may not, depending on the outcome of the game, be obliged to pay out more than the amounts wagered on a particular game. Moreover, an extraordinary run of bad luck on the ·part of the house may unpredictably deplete its funds. A bank, in theory, can be 'broken.' A lottery can never be broken in this sense. True, if a lottery operator offers a fixed prize—a particular automobile or piece of real property, for example—the ticket receipts may be insufficient to cover the cost. But the operator's success or failure in such a lottery depends only on *how many* entries are attracted, not on *which participant, or how many participants*, win the prize.

The outcome of the game or draw, in other words, does not determine whether the lottery operator makes or loses money on that game or draw." (*Western Telcon, Inc.* v. *California State Lottery, supra*, 13 Cal.4th 475, 487-488, italics in original.)

To summarize, a banking game requires that the operator (banker) wager its property against the property of the players. The banker gets to keep as its own the wagers of the losers, and it pays out of its own account the amounts due the winners. The banker hazards the gain and the loss, it wagers against the other players and like them its fortunes are at risk during play. The banker's gain or loss depends on whether the players win or lose; it profits when they lose and loses when they win. The banker has an interest in the outcome of each individual player's wagers because the bank gets to keep whatever a player loses. The banker is the one against the many, competing against the players.

The gaming terminals and class III card games that are the subject of Proposition 5 traditionally are operated as banking games. Under the model compact of Proposition 5, however, prizes for gaming terminals and class III card games are awarded instead under a players' pool prize system. The tribe's revenue comes from fees charged to all players rather than from retaining the wagers of losing players. The model compact describes the players' pool prize system as follows: " 'Players' pool prize system' means one or more segregated pools of funds that have been collected from player wagers, that are irrevocably dedicated to the prospective award of prizes in authorized gaming activities, and in which the house neither has [acquired] nor can acquire any interest. The Tribe may set and collect a fee from players on a per play, per amount wagered, or time-period basis, and may seed the player pools in the form of loans or promotional expenses, provided that seeding is not used to pay prizes previously won." (Gov. Code, § 98004, Tribal-State Gaming Compact, § 2.16; accord, Gov. Code, § 98006, subd. (a).)

A players' pool prize system has none of the characteristics of a banking game. Under that system, the players share in the pool according to their success at the game, the players can win no more than the amount wagered by all players, and the players cannot win anything from the game operator. The game operator's share is independent of the success or failure of the players and is not increased if any or all players lose and is not decreased if any or all players win. The players' pool prize system makes the gaming terminals and card games at issue here lotteries because "[t]he outcome of the game or draw . . . does not determine whether the lottery operator makes or loses money on that game or draw." (*Western Telcon, Inc.* v. *California State Lottery, supra*, 13 Cal.4th 475, 488.)

The majority reaches a different conclusion.[2] It concludes that the gaming terminals and card games to be operated by Indian tribes under a players' pool prize system are banking games and not lotteries. It bases this conclusion on the following asserted distinctions between the players' pool prize system and lotteries: A players' pool prize system operator retains an interest in the outcome of play; the players' pool prize system operator bets against the players, keeping all losing wagers and paying out on all winning wagers; and the payouts on any given round of play under a players' pool prize system are variable. (Maj. opn., *ante*, at pp. 607-609.) The first two assertions are incorrect, while the third is equally true of both traditional lotteries and the players' pool prize system.

First, a players' pool prize system operator does not retain an interest in the outcome of play. A game operator under a players' pool prize system has no more interest in the outcome of the game than any other lottery operator. Its income from a given round of play (in the form of player fees) is fixed and does not rise or fall depending on the success or failure of the players. The decision to make a future loan to the prize pool to seed future games is not "compelled," contrary to the majority (maj. opn., *ante*, at p. 608), and it does not give the operator any interest in the outcome of already completed games, just as a lottery operator's decision to offer a bigger prize in a future lottery does not give it any interest in the outcome of lotteries already completed. Nor does the fact that a high payout in a past game has delayed or prevented the repayment of a past loan to the prize pool by the operator give the operator an interest in the outcome of play, just as a lottery does not become a banking game simply because the operator might lose money if its revenues from operating the lottery are less than the cost of the prizes it offers.

Second, the players' pool prize system operator does not retain an interest in the outcome of play. As previously explained, neither the tribe nor anyone else acts as a "banker" who bets against the players and stands to profit or lose depending on the outcome of the gambling.

Third, the payouts on any given round of play under a players' pool prize system are no more variable than those of a lottery. Despite the majority's protestations to the contrary, the possibility that in a players' pool prize

---

[2]Although the majority and I both analyze whether games operated under a players' pool prize system are lotteries or banking games, our respective purposes in doing so are quite different. As explained at the outset of my opinion, I resolve this question to decide whether such games are authorized by IGRA as a matter of federal law; the majority decides this question to determine whether such games are prohibited by the casino gambling prohibition of section 19(e) of article IV of the California Constitution.

system the wagers collected in a given round of play may not all be awarded as prizes in that round of play does not distinguish that system from a lottery. In one common form of lottery, number-matching games like the Super Lotto of the California State Lottery, it is possible that no one will come up with the matching numbers to win the prize in a given round of play; in that case, the prize rolls over to the next round of play. Likewise, in a players' pool prize system, any amounts not won in one round of play become available as prizes in later rounds. The game operator does not acquire those amounts for its own account. Nor, contrary to the majority, can the pool itself sensibly be characterized as a bank simply because it collects wagers and pays winners, for those functions necessarily occur in every form of gambling.

Accordingly, gaming terminals and card games under a players' pool prize system are not banking games but lotteries. Because California permits lotteries, IGRA therefore, as matter of federal law, authorizes Indian tribes to offer gaming terminals and card games under a players' pool prize system. In turn, Proposition 5's model compact complies with IGRA by regulating these forms of authorized gambling, and it does not violate the California Constitution because it does not itself authorize the gambling.[3]

## CONCLUSION

The rise of Indian gambling in the past two decades has stirred deep passions and heated political debate. The voters of California sought to resolve the status of Indian gambling in our state by enacting the model Tribal-State Gaming Compact of Proposition 5. Because the model compact complies both with our state Constitution and with the federal Indian Gaming Regulatory Act, I would uphold the will of the voters and deny the petition for a writ of mandate.

---

[3] I see no merit to petitioners' other arguments against Proposition 5. Like compacts enacted by the Legislature, it is a proper legislative act, establishing a policy applicable to all within its scope, and does not infringe on the prerogatives of the executive. (See *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609].) Nor does it violate equal protection for the state, in response to the federal mandate of IGRA, to enact a compact recognizing the federal authorization of gambling on Indian lands. (*Washington* v. *Yakima Indian Nation* (1979) 439 U.S. 463 [99 S.Ct. 740, 58 L.Ed.2d 740].)