Filed 3/7/14

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KIRNPAL GREWAL et al.,<br><br>    Defendants and Appellants. | F065450/F065451/F065689<br><br>(Super. Ct. Nos. CV-276959,<br>CV-276958, CV-276961)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Weston, Garrou & Mooney, John H. Weston, G. Randall Garrou and Jerome H. Mooney for Defendants and Appellants Kirnpal Grewal and Phillip Ernest Walker.

William H. Slocumb and Christopher T. Reid for Defendant and Appellant John C. Stidman.

Lisa S. Green, District Attorney, Gregory A. Pulskamp and John T. Mitchell, Deputy District Attorneys, for Plaintiff and Respondent.

Downey Brand, Stephen J. Meyer, Tory E. Griffin and Kelly L. Pope for Net Connection Hayward as Amici Curiae on behalf of Defendants and Appellants.

-ooOoo-

In these three consolidated cases,[1] the People of the State of California by and through the Kern County District Attorney (the People) filed civil actions under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), seeking to enjoin several Internet café[2] businesses from continuing to engage in practices that allegedly violated the gambling prohibitions set forth at Penal Code sections 319 (unlawful lottery) and 330a, 330b and 330.1 (unlawful slot machines or devices).[3] When the People requested preliminary injunctions, the owners and operators of the Internet café businesses in question (i.e., Kirnpal Grewal, Phillip Ernest Walker & John C. Stidman; collectively defendants) opposed such relief on the ground that their businesses did not conduct lotteries but merely offered lawful sweepstakes that promoted the sale of their products. Additionally, while acknowledging that customers could reveal sweepstakes results by playing (on terminals provided on premises) a computer game program that simulated the

---

[1]    Two additional related cases (i.e., *People v. Nasser*, case No. F066645 & *People v. Elmalih*, case No. F066646) will be addressed by us in a separate opinion. We note the only difference in those cases from what is considered here is that a telephone card (rather than Internet time) was the product purchased to gain sweepstakes points used on game programs at the businesses' computer terminals. With no material differences, the same rationale and disposition follows in those cases as is stated here.

[2]    Broadly speaking, the term "Internet café" depicts a café or similar establishment that sells computer use and/or Internet access on its premises. As commentators have pointed out, many such businesses now promote the sale of their products (e.g., computer time, Internet access or telephone cards) by offering a sweepstakes giveaway that allows customers to ascertain their winnings, if any, by playing specialized game programs on the businesses' own computer terminals. Typically, these programs simulate casino slot machines or other gambling games. (See e.g., Dunbar & Russell, *The History of Internet Cafes and the Current Approach to Their Regulation* (2012) 3 UNLV Gaming L.J. 243, 243-245; Silver, *The Curious Case of Convenience Casinos: How Internet Sweepstakes Cafes Survive in a Gray Area Between Unlawful Gambling and Legitimate Business Promotions* (2012) 29 J. Marshall J. Computer & Info. L. 593, 594-599.)

[3]    Unless otherwise indicated, all further statutory references are to the Penal Code.

2.

look and feel of a slot machine or other game of chance, defendants maintained that the required statutory elements of an unlawful slot machine or gambling device were not present. The trial court disagreed with that assessment and granted the preliminary injunctions as requested by the People. Defendants have appealed from the orders granting such preliminary injunctions, raising the same arguments they made in the trial court.[4] Because we conclude the People will likely prevail on the claims that defendants violated prohibitions against slot machines or gambling devices under section 330b, we shall affirm the relief granted below.

## FACTS AND PROCEDURAL HISTORY

Since our opinion concerns three distinct Internet café businesses, we begin by summarizing the factual background of each of the underlying cases.[5]

Defendant Stidman's I Zone Internet Café

Defendant Stidman owns and operates a business known as the I Zone Internet Café (I Zone) in Bakersfield, California. I Zone sells Internet time to the public at a price of $20 per hour, which time may be used on a system of computer terminals located on the I Zone premises. In addition, I Zone sells copying services, packaging services and refreshments. To promote the sale of Internet time and other products, I Zone offers a sweepstakes to customers whenever they make a purchase. According to the sweepstakes rules, noncustomers may also enter the sweepstakes; that is, no purchase is necessary to

---

**4** After separate appeals were filed, we ordered the three cases consolidated. The consolidated cases herein are *People v. Grewal*, case No. F065450, *People v. Walker*, case No. F065451 and *People v. Stidman*, case No. F065689.

**5** Although the facts and circumstances shown below were *as of* the time of the hearings below, for ease of expression we primarily use the present tense.

enter.[6] The sweepstakes is effectuated through a computer software system provided by a company known as Capital Bingo.

Under the sweepstakes as operated by the software system, a person who purchases Internet time or other products at I Zone receives sweepstakes points for each dollar spent. A customer is also given sweepstakes points for his first purchase of the day as well as for being a new customer. For example, a new customer who buys $20 of Internet time receives a total of 3,000 sweepstakes points, consisting of 2,000 sweepstakes points for the purchase of Internet time, 500 sweepstakes points for the first $20 of Internet time purchased for that day, and 500 sweepstakes points for being a new customer. Additional sweepstakes points may be received if the customer buys refreshments. A white plastic card with a magnetic strip is provided to the customer, which card is activated by an I Zone employee at the register. When the customer swipes the card at an open computer terminal, he is given the option of using the Internet function or playing sweepstakes computer games. If he chooses the latter, the time spent playing sweepstakes computer games does not reduce the amount of Internet time available.[7] Both options are touch-screen activated and do not require a keyboard or mouse.

In playing the sweepstakes computer games, I Zone customers use their sweepstakes points in selected increments (simulating bets) on games with names such as

---

[6] To enter a sweepstakes without purchasing Internet time or other products, an individual may receive up to four free entries from the cashier each day upon request. Four additional entries are available by mailing a form with a self-addressed, stamped envelope.

[7] Detective Craig Checklenis of the Bakersfield Police Department initially reported that Internet time was reduced when he played the sweepstakes computer games. He later corrected himself, stating that "Internet time is not lost when playing the sweepstakes games."

"Buck Lucky," "Tropical Treasures" or "Baby Bucks." According to the I Zone sweepstakes rules, each increment level available for play "represents a separate sweepstakes."[8] As shown by photographic evidence, gambling-themed games resembling slot machines are prominently displayed on the I Zone terminals. According to the observations of Detective Checklenis, "[i]t appeared the subjects were playing casino style slot machine games on the computers.… The audible sounds were that of casino style slot machines." On a later inspection of I Zone, he surveyed the room and noted that no one was on the Internet, but rather "all the people using the computer terminals were playing the sweepstakes games."[9] Participants in the I Zone sweepstakes have a chance to win cash prizes in various amounts ranging from small sums to a top prize of $3,000.

In opposing the motion for preliminary injunction, Stidman presented evidence and argument regarding how the sweepstakes functioned. His position was essentially that the computer sweepstakes games played on the I Zone terminals were merely an entertaining way for customers to reveal a sweepstakes result. A customer could also reveal a sweepstakes result by other means, such as by using a special function on the computer terminal or by asking an I Zone employee at the register to print out a result on paper. As described in Stidman's opposition, "[e]ach time a customer reveals the results of a sweepstakes entry, [regardless of the means used], the next available sweepstakes entry in the 'stack' is revealed," in sequence, from a prearranged stack of entries. The

---

[8]    Based on the description provided by Stidman of how the software system conducts the sweepstakes program, this statement indicates that each increment level available for play would access a distinct "batch of sweepstakes entries" stacked in a particular order or sequence.

[9]    Consistent with the detective's observation, Stidman's evidence revealed that at least some of the I Zone patrons had a considerable surplus balance of Internet time on their accounts.

"next available sweepstakes entry" contains a predetermined result that would be the same regardless of which method was used to reveal it. Thus, when the customer engages the sweepstakes computer games, the outcome is determined by the particular sweepstakes entry that is being revealed at that time, not by the workings of the game itself. That is, the game simply *reveals* the predetermined result of the next sequential sweepstakes entry.

Stidman provided a further operational description of how the software system used by I Zone conducted the sweepstakes. The descriptive information was primarily based on declarations from Stidman's expert, Nick Farley, and an attorney opinion letter provided to Stidman (purportedly from Capital Bingo's attorney) disclosing the Capital Bingo operational "model." Allegedly, there were three distinct servers, referred to as (1) the Management Terminal, (2) the Point of Sale Terminal, and (3) the Internet Terminal. As summarized in the trial court by Stidman's counsel: "It is at the Management Terminal where all sweepstakes entries are produced and arranged. Each batch of sweepstakes entries has a finite number of entries and a finite number of winners and losers. Once a batch of sweepstakes entries is produced at the Management Terminal, it is 'stacked' … and then transferred to the Point of Sale Terminal in exactly the same order as when it left the Management Terminal. Each time a customer reveals the results of a sweepstakes entry, either at the Internet Terminal or at the Point of Sale, the next available sweepstakes entry in the 'stack' is revealed. In other words, the Internet Terminal simply acts as a reader and displays the results of the next sequential sweepstakes entry in the stack as it was originally arranged and transferred from the Management Terminal—it is never the object of play. In fact, exactly the same results [are displayed] for a specified sweepstakes entry whether the customer chooses to have the results displayed in paper format at the Point of Sale Terminal or in electronic format at an Internet Terminal." Additionally, Farley's declaration asserted that neither the Point of Sale Terminal nor the Internet Terminal had a random number generator and could not

be "the object of play," since those servers could not influence or alter the result of a particular sweepstakes entry, but merely displayed that result.

Defendant Walker's OZ Internet Café and Hub

Defendant Walker owns and operates a business called the OZ Internet Café and Hub (the OZ) in Bakersfield, California. Among other things, the OZ sells computer and Internet access (hereafter, Internet time) on computer terminals on its premises. The OZ promotes the sale of Internet time and other products with a sweepstakes giveaway that is implemented through a software system provided by a company known as Figure Eight Software. Participants in the sweepstakes have the chance to win cash prizes varying from small amounts to a top prize of $10,000 as set forth in the sweepstakes' odds tables.

Internet time may be purchased at the OZ for $10 per hour. When Internet time is purchased, a personal identification number (or PIN) is assigned to that customer by an employee of the OZ, who creates an account by which the customer may access the computers and Internet as well as play sweepstakes computer games. Customers are not charged for Internet time while they are playing the computer sweepstakes games. At the time of purchase, the customer receives 100 "sweepstakes points" for each dollar spent. As asserted by Walker, "[c]ustomers purchase product[s] consisting mostly of computer and Internet time at competitive prices and receive free sweepstake points in addition to the product purchased." Additionally, a customer may receive 100 free sweepstakes points every day that the customer comes into the OZ, and first-time customers receive 500 additional sweepstakes points. These sweepstakes points can be "used to draw the next available sequential entry from a sweepstake contest pool." This may be done and the result revealed in one of three ways: (i) asking an OZ employee to reveal a result, (ii) pushing an instant reveal button at the computer station, or (iii) playing computer sweepstakes games "that have appearances similar to common games of chance" at the computer terminals.

7.

The sweepstakes rules provide that no purchase is necessary to enter the sweepstakes. According to Walker, noncustomers may obtain free sweepstakes entries by asking an employee at the OZ or by mailing in a request.

When Detective Checklenis investigated the OZ, he asked Walker if customers had to sign a form to access the computers. Walker responded in the affirmative and showed Checklenis a "Computer Time Purchase Agreement." On the form, each customer is required to acknowledge that he understands the following matters before using the OZ computers: (i) that he is purchasing computer time and (ii) that the sweepstakes computer games are "not gambling," but are a "promotional game" in which all winners are predetermined. On the form, the customer also affirms that he understands "[t]he games have no [e]ffect on the outcome of the prizes won," but are merely an "entertaining way to reveal [his] prizes and [he] could have them instantly revealed and would have the same result."

In opposing the motion for preliminary injunction, Walker's declaration explained what happens when a customer uses the sweepstakes computer game: "If a customer utilizes the pseudo-interactive entertaining reveal interface[,] the customer can encounter some games that have appearances similar to common games of chance." However, before any "spinning wheels or cards" appear on the screen, "the sweepstake entry has already been drawn sequentially from a pool of entries and is predetermined. There is no random component to the apparent action of the images in the interface even though it simulates interactivity. Instead, the images will display a result that matches the amount of any prize revealed in the entries. [Citation.] [¶] As told to the customers in the rules and in disclaimers, the pseudo interactive interface does not 'automatically' or 'randomly' utilize any play to obtain a result."

Walker's opposition also described in greater detail the operation of the software system utilized by the OZ to run the sweepstakes. Walker asserted by declaration that under that software system, the issue of whether a customer has won a cash prize is

8.

determined at the point in time that his entry is drawn from a sweepstakes pool. Each such entry has a previously assigned cash prize of zero or greater. Entries are drawn sequentially from one of 32 sweepstakes pools created by the software company.[10] The entries in each pool are prearranged in a set order or sequence by the software company, and the OZ has no control over the order or sequence of the entries or the corresponding results. Access to a particular sweepstakes pool is determined by how many points the customer chooses to use (or bet) at any one time. Each pool has its own prizes and its own separate sequence of entry results. When a customer selects a sweepstakes pool, the software system assigns to him the next available entry result in that pool, in sequence. At that point, the result is established and cannot be affected by the computer game play, which merely reveals the established result. Additionally, Walker asserted that a specific sequential entry will yield the same result regardless of the method a customer used to draw and reveal it.

Defendant Grewal's A to Z Café

Defendant Grewal is the owner and operator of the A to Z Café in Bakersfield, California. Grewal's opening brief describes the sweepstakes conducted at his A to Z Café in identical terms to the sweepstakes operated by Walker. Our review of the evidentiary record confirms that the sweepstakes program used by the A to Z Café was in all material respects the same as the one described above regarding Walker's business, the OZ, and the parties likewise agree that the facts and circumstances of the two cases are in essence the same. Therefore, rather than engage in an unnecessary repetition of facts, we simply note that the material facts regarding the A to Z Café are the same as

---

**10**    The printed sweepstakes rules also refer to such pools as "multiple finite deals of entries."

described above concerning the OZ. When we discuss Walker's system, the same is true of Grewal's.

Procedural Background

All three cases were commenced on June 21, 2012, by the Kern County District Attorney's Office on behalf of the People, filed as separate civil actions against Stidman, Walker and Grewal, respectively. Each complaint sought injunctive relief under Business and Professions Code section 17200 based on defendants' alleged violations of antigambling provisions of the Penal Code in the operation of their respective Internet café businesses.[11] The Penal Code provisions at issue under the pleadings were those relating to unlawful lotteries (§ 319) and unlawful slot machines or gambling devices (§§ 330a, 330b & 330.1). On July 23, 2012, hearings were held on the People's motions for preliminary injunctions by which the People sought to prohibit the sweepstakes operations until or unless otherwise ordered by the court after a trial on the merits. The trial court granted the requested relief as against each defendant. Formal written orders granting the preliminary injunctions were entered by the trial court on August 1, 2012, from which each defendant separately appealed. We ordered the three appeals consolidated.

## DISCUSSION

**I.      The Issue in the Trial Court and Our Standard of Review**

The decision to grant a preliminary injunction rests in the sound discretion of the trial court. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.) Ordinarily, "two interrelated factors" are evaluated by the trial court in deciding whether to exercise its discretion to issue a preliminary injunction: "The first is the likelihood that the plaintiff

---

**11**      Other relief, such as civil penalties, was also sought in each of the underlying complaints filed by the People.

will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*Id*. at pp. 69-70.)[12] An order granting or denying such interlocutory relief reflects the trial court's evaluation of the controversy on the record before it at the time of its ruling; thus, "it is not an adjudication of the ultimate merits of the dispute." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109.) In view of that latter principle, we base our opinion upon the state of the record that was before the trial court in granting interlocutory relief, and although on *those* initial facts we reach certain conclusions, we leave open the possibility—however remote it may be here—that a trial on the merits based on a more fully developed factual record may cast these matters in a different light.

We review an order granting a preliminary injunction under the abuse of discretion standard. (*People ex rel. Gallo v. Acuna*, *supra*, 14 Cal.4th at p. 1109.) If the evidence is in conflict, we interpret the facts in the light most favorable to the prevailing party. (*Cinquegrani v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 741, 746.) To the extent that the grant of a preliminary injunction was based on statutory construction, we review the issue of statutory construction de novo. (*Ibid*.) The question of whether, under a given state of facts, a particular device is an unlawful slot machine is one of law. (*Trinkle v. California State Lottery* (2003) 105 Cal.App.4th 1401, 1405 (*Trinkle II*).) We review that question of law de novo.

---

**12**    Where, as here, a governmental entity seeks specifically provided injunctive relief to prohibit an alleged violation of a statute, once that governmental entity makes a showing that it is likely to prevail at trial, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant. (*IT Corp. v. County of Imperial*, *supra*, 35 Cal.3d. at pp. 71-72; see Bus. & Prof. Code, §§ 17203 [providing for injunctive relief against unlawful business practices], 17202 [includes specific or preventive relief to enforce penal law].)

11.

In the instant appeal, defendants contend that the trial court erred or abused its discretion in issuing the preliminary injunctions because, allegedly, there was no likelihood that the People would be able to prevail on the merits.  We proceed on this understanding of defendants' claims.  (See *Tosi v. County of Fresno* (2008) 161 Cal.App.4th 799, 803-804.)

## II.    Statutory Construction of Penal Code Sections

Because our review of the trial court's rulings requires that we interpret or apply certain Penal Code provisions on the record before us, we briefly set forth the relevant principles of statutory construction.

"'[T]he objective of statutory interpretation is to ascertain and effectuate legislative intent.  [Citations.]  To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning.  [Citations.]  When the language of a statute is clear, we need go no further.'"  (*People v. Beaver* (2010) 186 Cal.App.4th 107, 117.)  When the language is susceptible of more than one reasonable interpretation, however, we look to extrinsic aids, including the objects to be achieved, the evils to be remedied, the legislative history, public policy, and the statutory scheme of which the statute is a part.  (*Ibid.*; accord, *People v. Woodhead* (1987) 43 Cal.3d 1002, 1008.)

Under the rule of lenity, which defendants argue should be applied here, any doubts as to the meaning of a criminal statute are ordinarily resolved in a defendant's favor.  (See, e.g., *People v. Overstreet* (1986) 42 Cal.3d 891, 896; *Walsh v. Dept. Alcoholic Bev. Control* (1963) 59 Cal.2d 757, 764-765).[13]  However, that rule of statutory

---

**13**    The rule is sometimes also described as a principle of strict construction.  (See, e.g., *People v. Overstreet*, *supra*, 42 Cal.3d at p. 896; *People v. Avery* (2002) 27 Cal.4th 49, 58.)

interpretation is only applied where the statute is reasonably susceptible of two constructions that are in relative equipoise—that is, resolution of the statute's ambiguity in a convincing manner is impracticable. (*People v. Lee* (2003) 31 Cal.4th 613, 627; *People v. Avery*, *supra*, 27 Cal.4th at p. 58; *People v. Jones* (1988) 46 Cal.3d 585, 599.) "Thus, although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*People v. Avery*, *supra*, at p. 58 [citing § 4].)[14] As recently stated by our Supreme Court, "'[t]he rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute. [Citation.] Rather, the rule applies "'only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule.'" [Citation.]' [Citation.]" (*People v. Nuckles* (2013) 56 Cal.4th 601, 611.)

No such ambiguity exists in this case, as will become apparent in the discussion that follows and, therefore, the rule of lenity does not apply.[15]

## III. An Unlawful Slot Machine or Device Was Shown by the Record

We begin with the issue of whether the devices in question (i.e., defendants' software systems operating the computer sweepstakes games on the networked terminals

---

**14** Section 4 provides: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

**15** Even assuming a strict construction, however, that would not require the statutory wording to be strained or distorted to exclude conduct clearly intended to be within its scope, where the words are given their fair meaning in accord with the evident intent of the Legislature. (*Trinkle v. Stroh* (1997) 60 Cal.App.4th 771, 783 [so holding, construing provision relating to slot machines]; *People v. Shira* (1976) 62 Cal.App.3d 442, 460 [same, construing statute relating to lotteries]; cf. § 4 [penal provisions construed according to their fair import].)

provided to customers) were unlawful slot machines or gambling devices under the applicable penal statutes.

Sections 330a, 330b and 330.1 contain distinct but overlapping provisions that prohibit "slot machine[s] or device[s]" as defined in each section.[16] The definitional language in each section is similar, but not identical. (Cf. §§ 330a, subd. (a), 330b, subd. (d) & 330.1, subd. (f).)[17] Arguably the broadest of the three is section 330b, which defines a "'slot machine or device'" in the following terms: "[A] machine, apparatus, or device that is adapted … for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money … or thing of value .…" (§ 330b, subd. (d).)[18] The People center their discussion on section 330b; we will do the same.

---

[16] Section 330a was enacted in 1911, while sections 330b and 330.1 were both enacted in 1950. (Stats. 1911, ch. 483, § 1, p. 951 [re: § 330a]; Stats. 1950, 1st Ex. Sess., ch. 17, § 1, p. 452 [re: § 330b]; Stats. 1950, 1st Ex. Sess., ch. 18, § 1, p. 454 [re: § 330.1].)

[17] Our courts have recognized the three provisions are "similar" in their terms (e.g., *Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 593), but also have differences (e.g., *People ex rel. Lockyer v. Pacific Gaming Technologies* (2000) 82 Cal.App.4th 699, 703, fn. 6; but see *Trinkle II*, *supra*, 105 Cal.App.4th at pp. 1409-1410, fn. 7 [treating §§ 330b & 330.1 as identical]).

[18] Section 330.1, subdivision (f), defines a "slot machine or device" in relevant part as "one that is, or may be, used or operated in such a way that, as a result of the insertion of any piece of money or coin or other object the machine or device is caused to operate or may be operated or played, mechanically, electrically, automatically, or manually, and by reason of any element of hazard or chance, the user may receive or become entitled to receive anything of value .…"

Section 330a, subdivision (a), prohibits "any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other

14.

California courts have found section 330b to prohibit a variety of devices where prizes may be won based on chance. In *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, a vending machine that dispensed telephone cards for $1 included a "sweepstakes" feature with audio-video displays resembling a slot machine. When customers purchased a phone card for $1, they were given a chance to win a cash prize of up to $100. A "preset computer program" determined the results of the sweepstakes; the user could not control or alter the results. (*Id*. at pp. 701-702.) The Court of Appeal held the vending machine was a prohibited slot machine under the plain language of section 330b, because "[b]y the insertion of money and purely by chance (without any skill whatsoever), the user may receive or become entitled to receive money." (*Id*. at p. 703.) Similarly, in *Trinkle v. Stroh*, *supra*, 60 Cal.App.4th 771, a jukebox that dispensed four songs for $1 was found to be a prohibited slot machine or device under section 330b because the operators also received a chance to win a cash jackpot. (*Id*. at pp. 776-780; see also *Score Family Fun Center, Inc. v. County of San Diego* (1990) 225 Cal.App.3d 1217, 1221-1223 [holding that an arcade video game that simulated card games violated § 330b because operators could, as a matter of chance, win free games or extended play].)

Based on these authorities, the People argue that an unlawful slot machine or device under section 330b was involved in each of defendants' businesses at issue in this consolidated appeal. According to the People, this conclusion follows from the facts that, under defendants' sweepstakes software systems as operated on their computer networks

valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money … or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance …."

and terminals, upon the payment of money (i.e., the purchase of Internet time), patrons can activate computer sweepstakes games on the terminals and, based on "chance" or "other outcome of operation unpredictable by" the patron, win cash prizes. We agree with that analysis. That is, on the question of whether it was appropriate for the trial court to grant the preliminary injunctions, we conclude that the record below was adequate to show the People would likely prevail on the merits under section 330b.

We explain our conclusion by examining each of the statutory elements of an unlawful "'slot machine or device'" under section 330b. Before we begin that task, a brief comment is needed concerning our approach. One Court of Appeal decision provided the following distillation of the three elements necessary to constitute a slot machine or device under section 330b: "(1) the insertion of money or other object which causes the machine to operate, (2) the operation of the machine is unpredictable and governed by chance, and (3) by reason of the chance operation of the machine, the user may become entitled to receive a thing of value." (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1410).) We take issue with this formulation because section 330b, subdivision (d), refers to *chance* "or*" unpredictable* outcome, while *Trinkle II* uses the conjunctive "and" in its articulation of the second element. As noted in *Score Family Fun Center v. County of San Diego*, *supra*, 225 Cal.App.3d, at page 1221, those terms are clearly in the disjunctive. As a result, this element of the statute (commonly referred to as the chance element) can be satisfied by showing that a prize may be won by reason of an "outcome of operation *unpredictable*" to the user (§ 330b, subd. (d), italics added; *Score Family Fun Center v. County of San Diego, supra*, at p. 1221). No further or additional proof relating to "chance" is needed.[19] Additionally, we disagree with *Trinkle II's* description

---

[19]    The disjunctive statutory wording does not mean that chance and unpredictability are entirely separable, but only that they may be distinguished in terms of what must be shown. Obviously, when the outcome of operation of a device is entirely unpredictable

16.

of the manner in which the chance element must be realized in order to constitute a slot machine or device under section 330b.  Specifically, *Trinkle II* held that the chance element must be created by a randomizing process occurring at the moment the machine or device is being played.  (*Trinkle II*, *supra*, at p. 1411.)  As will be explained below, we think that holding was in error.  Since we disagree with *Trinkle II* on these significant matters relating to the statutory elements, we adopt a different approach here than what was articulated in that case.

In light of the foregoing, and in view of the complexities of the present case, we believe it is best to frame our discussion of the elements of section 330b in terms that are closely tethered to the language of the statute itself.  We now turn to those statutory elements as revealed in the statutory language.

The first element specified in the statute is that "*as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated ….*"  (§ 330b, subd. (d), italics added.)  Defendants argue that this element is lacking because no coin or similar object was inserted into a slot by customers at the computer terminal to cause the sweepstakes computer games to operate.  We reject that argument.  Here, the insertion of a PIN or the swiping of a magnetic card at the computer terminal in order to activate or access the sweepstakes games and thereby use points received upon paying money at the register (ostensibly to purchase a product) plainly came within the broad scope of the statute.  The statute

---

to the user, it is *also* involving chance, since for purposes of our gambling laws "'[c]hance'" means that "winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill."  (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at p. 592.)  Here, we believe the statute is simply making clear that it is *sufficient* to establish this element of an unlawful slot machine or device if a prize may be won by reason of an "outcome of operation unpredictable by [the user]."  (§ 330b, subd. (d).)

17.

expressly includes the catchall phrase "*by any other means*." (§ 330b, subd. (d), italics added.) Even though a coin, money or object (e.g., a token) was not inserted into a slot, the games were commenced *by other means* analogous thereto which effectively accomplished the same result and, therefore, this element is satisfied.

The second element of a "slot machine or device" articulated in section 330b is that "*by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any ... money ... or thing of value ....*" (§ 330b, subd. (d), italics added.)[20] This language describes the so-called "chance" element—that is, the requirement that any potential to win a prize must be based on hazard, chance or other outcome of operation unpredictable to the user of the machine or device.

Here, it is clear that defendants' customers may become entitled to win prizes under the software systems implementing defendants' computer sweepstakes games based on "hazard or chance or of other outcome of operation unpredictable" to the user. (§ 330b, subd. (d).) That is, we agree with the People that the chance element is satisfied. Under California gambling law, "'[c]hance'" means that "winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at p. 592.) Since customers playing defendants' computer sweepstakes games can exert no influence over the outcome of their sweepstakes entries by means of skill, judgment or

---

[20] Prior to 2004, this portion of the statute was worded as follows: "'by reason of any element of hazard or chance or of other outcome of *such* operation unpredictable by him ....'" (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1409, fn. 6, italics added.) In 2004, as a result of housekeeping legislation that made technical, nonsubstantive changes to numerous statutes, the word "such" appearing before the word "operation" was removed from section 330b. (Stats. 2003, ch. 264, § 1.)

18.

how well they play the game, it follows that we are dealing with systems that are based on chance or luck. Moreover, by describing their promotional giveaways as *sweepstakes*, defendants have effectively admitted to the chance element because a "'[s]weepstakes'" is, by definition, "any procedure for the distribution of anything of value by lot or by chance that is not unlawful under other provisions of law…." (Bus. & Prof. Code, § 17539.5, subd. (a)(12).)[21] Our conclusion is further supported by the official rules of defendants' sweepstakes, which disclose odds or chances of winning and reiterate that the manner of playing the game does not alter the outcome of an entry.

(A)    We Follow *People ex rel. Lockyer v. Pacific Gaming Technologies*

Moreover, even though all sweepstakes entries were previously arranged in batches (or pools) that had *predetermined* sequences, that fact does not change our opinion of this issue (i.e., the chance element) because the results would still be unpredictable and random from the perspective of the user. Section 330b, subdivision (d), refers to chance "*or* of other outcome of operation *unpredictable by him or her* …." (Italics added.)[22] The situation here is clearly analogous to what was described in *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, where "[a] preset computer program determine[d] the results of the sweepstakes." (*Id*. at p. 702.) The machine or device in that case (a "VendaTel" that

---

[21]    The difference between a lawful sweepstakes and an unlawful lottery has nothing to do with the chance element. Rather, the difference is that a sweepstakes does not require that consideration be paid to enter. (See § 319 [elements of lottery include consideration]; *California Gasoline Retailers v. Regal Petroleum Corp*. (1958) 50 Cal.2d 844, 861-862 [promotional sweepstakes was not an unlawful lottery since consideration element was absent where no purchase necessary to enter].)

[22]    In the words of an out-of-state case addressing this same issue, "'[w]hat the machine "knows" does not affect the player's gamble.'" (*Moore v. Miss. Gaming Com'n* (2011) 64 So.3d 537, 541.)

19.

distributed a telephone card to each customer while entering them in a chance to win a prize) had a "'10 percent payout structure'" where it would "pay[] out $500 in prizes for every $5,000 paid into the machine" with "'predetermined winners' spread out over a period of time." (*Id*. at p. 702, fn. 4.) Under those facts, the Court of Appeal held that the users of the device became entitled to receive cash prizes "*purely by chance* (without any skill whatsoever)." (*Id*. at p. 703, italics added.)[23] The same is true here. Even if the sequence of entries has been electronically frontloaded into defendants' integrated system, patrons win cash prizes based upon "hazard or chance or of other outcome of operation unpredictable by [the patron]" in violation of section 330b, subdivision (d). Therefore, the chance element is satisfied.[24]

Finally, whether viewed as a third element or an aspect of the second, the statute requires that "*by reason of*" the chance element, a prize or thing of value may be won. (§ 330b, subd. (d), italics added.) Here, it is clear that defendants' customers may become entitled to receive a thing of value (i.e., cash prizes in varying amounts) by reason of the "chance" or "unpredictable" operation of defendants' software systems that run the computer sweepstakes games. (*Ibid*.)

---

[23]    As the Court of Appeal queried later in that same case, "if it isn't chance, what is it that determines whether the customer wins $100 for his $1?" (*People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at p. 707.)

[24]    If this were not the case, then even a casino-style slot machine would be legal as long as it was operated by a computer system that had previously arranged the sequence of entry results in a fixed order. Such a computer system might conceivably frontload hundreds of millions of discrete entry results into a predetermined sequence. A customer using that device would be surprised to learn that merely because there is a preset sequence, he is not playing a game of chance. Of course, in reality, that is exactly what he is doing. As aptly remarked in *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at page 701, "if it looks like a duck, walks like a duck, and sounds like a duck, it is a duck." (Fn. omitted.)

(B)     We Distinguish *Trinkle II*

In *Trinkle II*, the Court of Appeal reached the unsurprising conclusion that a vending machine that simply dispenses California State Lottery tickets in the sequential order that they were loaded into the machine is not an unlawful slot machine. However, certain statements made by the Court of Appeal in reaching that conclusion are specifically relied on by defendants herein. In explaining why the element of chance was not present, *Trinkle II* observed: "If a player purchases his ticket from a [Scratcher's vending machine, or SVM], the player obtains the ticket by inserting money into the machine and pushing a button, which releases the next ticket in sequence, according to the order in which it was printed and loaded into the SVM bin. Nothing about the machine or its operation by the customer alters the order in which the tickets were arranged at the time they were printed." (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1411.) The court further observed that "SVM's do not have computer programs that generate random numbers or symbols, nor do they have any capability of conducting a process of random selection or other kind of chance selection." (*Id.* at pp. 1411-1412.) Since the only element of chance was due to "the printing of the winning tickets and the placement of those tickets in a predetermined sequence" at the time the tickets were manufactured, the SVM itself had no role in outcomes because no further element of chance was involved in connection with the operation or play of the machine. (*Id.* at p. 1412.) In other words, *Trinkle II* explained that unless the element of chance is generated by the machines themselves at the time the customer plays or operates it (like the spinning wheels of the original mechanical slot machines or a computer program that shuffles the entries), it is only a vending machine.

Defendants insist that their sweepstakes systems are on par with the vending machine in *Trinkle II*, since customers playing defendants' computer sweepstakes games merely receive the next available entry result from a stack that is in a previously arranged, sequential order. We disagree.

21.

For at least two reasons, we hold that *Trinkle II* does not salvage the devices at issue in the present appeal. First, we disagree that the chance element must *always* be generated by some randomizing action of the device itself when it is being played. Section 330b only requires that prizes may be won "by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her .…" (§ 330b, subd. (d).) Under this broad wording, if the entries are arranged in a particular order beforehand, rather than rearranged each time the game is played, it will still suffice. Either way, the next sequential entry/result that is dealt out by the software system will be, from the perspective of the player, by "chance or of other outcome of operation unpredictable by him or her .…"[25] (*Ibid*.)

Second, *Trinkle II* is distinguishable factually because, in the words of a recent federal district court decision, it involved a passive vending machine that "simply delivered a finished product—the lottery ticket." (*Lucky Bob's Internet Café, LLC v. California Dept. of Justice, et al*. (S.D.Cal. 2013) 2013 U.S. Dist. Lexis 62470, p. *8 (*Lucky Bob's*).) Here, in contrast, all the trappings and experiences involved in playing traditional slot machines are actualized in one form or another by defendants' sweepstakes software systems and networked computer terminals, since in each case points are received upon making a purchase, a game program is activated by the customer at a terminal, points are used or bet in selected increments, audio-visual scenes are played out on the screen to create the feel and anticipation of a slot machine or other gambling game, and prizes are won. For these reasons, the integrated systems in our case are in a different category than the vending machine in *Trinkle II*. The mere fact that winnings

---

**25**     To use an analogy, whether a deck of cards was shuffled the day before, or at the moment the player sits down at the table and places a bet, it is still a matter of chance whether the ace of spades is the next card dealt.

are based on a predetermined sequence of results programmed into the software system, rather than on a randomly spinning wheel (or the like), does not change the nature and character of devices herein, which as integrated systems function as slot machines.[26]

As should be apparent from the above analysis, we are treating each defendant's complex of networked terminals, software gaming programs and computer servers as a single, integrated system. Under section 330b, subdivision (d), an unlawful "'slot machine or device'" is not limited to an isolated or stand-alone piece of physical hardware, but broadly includes "a machine, *apparatus*, or device that is *adapted*" for use as a slot machine or device. (*Ibid*., italics added.) As defined in dictionaries, the ordinary meaning for the term "apparatus" includes "a group or combination of instruments, machinery, tools, or materials having a particular function" (Random House Webster's College Dict. (1992) p. 66), as well as "[t]he totality of means by which a designated function is performed or a specific task executed" (Webster's II New College Dict. (2001) p. 54). Here, each defendant's system of gaming software, servers and computer terminals plainly operated together as a single apparatus. (§ 330b, subd. (d).) While it is true that the end terminals or computer monitors used by patrons—if considered in isolation—may not intrinsically or standing alone contain all the elements of a slot machine, in each case they are part of an integrated system or apparatus wherein

---

**26** In *Lucky Bob's*, the district court correctly focused on all of the components of an integrated system functioning together in that case: "Plaintiff's operating system can be distinguished from the vending machine in *Trinkle* by the integrative nature of its components. Here, the sweepstakes winnings necessarily involved the 'value added' of each component of Plaintiff's integrative system—from the computers that read the magnetic strip card; the database server controlling the games; and the point of sale computer that allowed the employee to create the accounts, add internet time and sweepstakes entries and play out redeemed entries." (*Lucky Bob's*, *supra*, 2013 U.S. Dist. Lexis 62470 at pp. *8-9.)

23.

the various parts or components work together so as to operate in a manner that *does* constitute an unlawful slot machine or device.

(C)    Other Issues

We briefly address two remaining issues.  Defendants suggest that the devices in question cannot qualify as slot machines or devices under section 330b due to a lack of an adequate showing of consideration.  We find the argument unpersuasive.  Unlike section 319 (regarding lotteries), section 330b does not directly specify that consideration is an element.  Therefore, it would seem that as long as the express statutory elements of section 330b are satisfied, no separate showing of consideration is needed.  In other words, to the extent that consideration is a factor under section 330b, it is simply subsumed by the existing statutory elements.  Since those elements were shown here, nothing more was required.  (*Trinkle v. Stroh*, *supra*, 60 Cal.App.4th at pp. 780-781.)  Other cases have essentially followed this approach by concluding that even if consideration is necessary in slot machine cases, its existence will be found where a connection exists between purchasing a product from a vending machine or device and being given chances to win a prize.  (*Id*. at pp. 781-782; *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at pp. 705-706.)  "'Once the element[s] of chance [and prize]'" are added to a vending machine or device, it is reasonable to assume that "'people are no longer paying just for the product regardless of the value given that product by the vender.'"  (*Trinkle v. Stroh*, *supra*, at p. 782; accord, *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, at pp. 704-707.)  That is the case here as well, since points are given to play the computer sweepstakes games on defendants' terminals based on dollars spent in purchasing products—that is, the elements of chance and prize are added to the purchase.  Additionally, to the extent that defendants are raising the issue of consideration by analogy to the cases addressing lotteries (e.g., *California Gasoline Retailers v. Regal Petroleum Corp.*, *supra*, 50 Cal.2d at pp. 851-862 [consideration element of § 319 lacking where no purchase necessary to enter]), that

24.

argument likewise fails because "lottery cases (which are governed by § 319) are not controlling on the issue of illegal slot machines," since they are separate things under the law. (*Trinkle v. Stroh*, *supra*, at p. 781.)[27]

Finally, defendants argue their integrated systems cannot be slot machines on the ground that they are not house-banked games in which the owner has an interest or stake in the outcome. (See *Trinkle II*, *supra*, 105 Cal.App.4th at p. 1412 [so indicating].) We disagree with the premise that only a house-banked game may constitute an unlawful slot machine or device. Section 330 forbids persons from playing or conducting any "banking … game played with cards, dice, or any device." Sections 330a, 330b and 330.1 *separately* prohibit slot machines or devices as defined therein. No mention is made in the latter statutes of any requirement that the slot machine or device be a house-banked game. We are constrained to follow the explicit definition of an unlawful slot machine or device provided in the applicable statutory language, which is broad enough to include defendants' devices whether or not they are house-banked.[28] (See *Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at pp. 593-594 [noting broad scope of slot machine statutes].)

We conclude on the record before us that the People are likely to prevail on the merits of its claims that the particular devices at issue were unlawful "slot machine[s] or device[s]" under section 330b. Accordingly, we affirm the trial court's orders granting preliminary injunctions. Because the foregoing analysis provides sufficient grounds to

---

[27]     Additionally, we note that section 330b, subdivision (d), explicitly states that a device meeting the statutory criteria set forth therein constitutes an unlawful slot machine or device "irrespective" of whether a product is also sold by that same machine or device. (See also § 330.1, subd. (f) [same wording].)

[28]     To put it another way, we decline to insert a new element into section 330b (that the device be house-banked) that the Legislature did not put there.

affirm the trial court's orders, it is unnecessary to address the additional issue raised by the parties of whether or not the sweepstakes programs may also have constituted unlawful lotteries under section 319.

## **DISPOSITION**

The orders of the trial court are affirmed. Costs on appeal are awarded to the People.

_____

Kane, J.

WE CONCUR:

_____

Levy, Acting P.J.

_____

Franson, J.